**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

MONTE D. MCFALL,
              *Defendant-Appellant.*

No. 07-10034

D.C. No.
CR 02-0468 MCE

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
December 8, 2008—San Francisco, California

Filed March 9, 2009

Before: Mary M. Schroeder, A. Wallace Tashima, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Tashima

## COUNSEL

Victor S. Haltom, Sacramento, California, for the defendant-appellant.

Benjamin B. Wagner, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

## OPINION

TASHIMA, Circuit Judge:

Monte D. McFall ("McFall"), a former lobbyist and local elected official, stands convicted of nine counts of attempted extortion and conspiracy to commit extortion, 18 U.S.C. § 1951, six counts of honest services mail fraud, 18 U.S.C. §§ 1341, 1346, and two counts of attempted witness tampering, 18 U.S.C. § 1512(b)(1), (3). He was sentenced to 121 months' imprisonment and a $50,000 fine.

On appeal, McFall challenges the sufficiency of the evidence supporting the attempted extortion (Counts 2 and 3) and conspiracy to commit extortion (Count 4) convictions, the jury instructions relating to the government's "official right" theory of attempted extortion (Count 11), and the district court's exclusion of exculpatory grand jury testimony on Count 14.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse these five convictions.

## BACKGROUND

The charges against McFall concern corrupt profiteering among a group of state and local officials in San Joaquin County, California. The principal players are: Neat Allen Sawyer ("Sawyer"), a former prosecutor in the San Joaquin County District Attorney's Office and, at the time of the events at issue, the Chief Deputy Director of the Governor's Office of Criminal Justice Planning ("OCJP"), T. Baxter Dunn ("Dunn"), former Sheriff of San Joaquin County, Lynn

---

[1] In this opinion we address McFall's contentions relating only to Counts 2, 3, 4, 11, and 14 of the final superseding indictment. McFall's other contentions are addressed in a separate, concurrently filed memorandum disposition in which we affirm McFall's conviction on the remaining 12 counts. Accordingly, the facts relevant only to the other counts are omitted.

Bedford ("Bedford"), former San Joaquin County supervisor, and McFall, a lobbyist and former member of the Board of Trustees of Water Reclamation District 17 (the reclamation district responsible for maintenance of a portion of the levees along the San Joaquin River).[2]

Dunn, Sawyer, and McFall worked in concert to support Bedford's candidacy for a county supervisor's seat that had become vacant in 2001. They raised money and solicited political support on his behalf. Bedford was ultimately appointed to the open seat. Although he had no official staff position, McFall represented himself as Bedford's proxy, and the government introduced evidence that Bedford told others that McFall spoke for him.

Shortly after Bedford's appointment, Dunn, Sawyer, and McFall formed two entities, MSD Ventures, Inc. (short for "McFall, Sawyer, Dunn") and SMTM Partners, LP, (short for "Show me the Money"). The partners sought to further their own private economic interests through the exercise of public powers, and specifically through their ties to Bedford. The government filed a final superseding indictment (the "indictment") against all four men on September 9, 2004. Bedford, Sawyer, and Dunn all pleaded guilty between January 11-18, 2005, roughly two weeks before their joint trial was set to begin. Sawyer and Dunn each pleaded to one count of honest services mail fraud, 18 U.S.C. §§ 1341, 1346, and were sentenced to serve six-month prison terms and six-months of home confinement. Bedford pleaded guilty to one count of making false statements in violation of 18 U.S.C. § 1001, and

---

[2]Reclamation districts are special purpose local government entities, organized under state law, responsible for constructing and maintaining drains, canals, water gates, levees, and other irrigation works, as well as assessing taxes on landholders within the district to carry out these projects. *See generally* CAL. WATER CODE § 50000 *et seq.* McFall was elected a trustee of Water Reclamation District 17 in 1991, and held the position until resigning in March 2002.

received six-months of home confinement and three years' probation.

As a part of their plea agreements, Sawyer and Dunn both "agree[d] to cooperate fully with the government with respect to its investigations and prosecutions of public corruption in the Eastern District of California and elsewhere." Prosecutors ultimately elected not to call either man as a witness at McFall's trial, despite their authority to do so pursuant to the plea agreements. When McFall sought to call Sawyer, Bedford, and Dunn as defense witnesses, each invoked his Fifth Amendment right not to testify.

On March 8, 2005, a jury returned a verdict convicting McFall of attempted extortion, conspiracy to commit extortion, honest services mail fraud, and witness tampering. The jury convicted McFall of seventeen of the twenty counts charged in the indictment and acquitted him on three counts of mail fraud. The district court sentenced him to 121 months' imprisonment and a $50,000 fine — the maximum sentence in the advisory Guidelines range. With respect to the counts disposed of in this opinion, the relevant facts are as follows.

*The Calpine Scheme (Counts 2, 3, and 4)*

In 2001, Calpine Corporation ("Calpine") and Sunlaw Energy Corporation ("Sunlaw") were competing to secure the right to build a power plant at a site in the Port of Stockton.[3] McFall and his partners (acting through their SMTM partnership) entered into a consulting contract with Sunlaw under which the partners stood to reap substantial financial rewards if Sunlaw obtained the right to build at the Port of Stockton site, and an even greater sum if the plant was actually built. According to the evidence, McFall and his partners sought to

---

[3]The Port of Stockton is an inland deep water port in Stockton, California, located on the San Joaquin River. Stockton is the San Joaquin County seat.

undermine Calpine's chances of prevailing at the Port of Stockton by mounting political opposition to another pending Calpine project in neighboring Alameda County.

Calpine was in the process of securing a permit from the California Energy Commission ("CEC") for its Alameda County project. McFall warned Calpine representatives that if they did not drop their bid for the Port of Stockton site, he would use his political influence to create a "public outcry" over the project, thereby complicating the permitting process. After Calpine declined to withdraw its bid, McFall and his partners conspired to pass a resolution through the San Joaquin County Board of Supervisors raising environmental, health, and safety concerns about Calpine's Alameda County project. Dunn appeared at the meeting and denounced Calpine's project as a threat to public safety. Bedford sponsored the resolution, and it passed 4-1. The resolution was then transmitted to the CEC. The indictment charged that this conduct amounted to attempted extortion (Counts 2 and 3) and conspiracy to commit extortion (Count 4) under color of official right, in violation of the Hobbs Act.

*The Golden State Developers Scheme (Count 11)*

In 2001, McFall contacted an attorney that represented Golden State Developers ("Golden State") and invited him to a fundraiser for Bedford. A few weeks after attending the event, the attorney and another Golden State representative met with Bedford and McFall at Bedford's county office. The participants discussed Golden State's pending development projects, and Bedford indicated that McFall could help them with the process of securing the necessary permits. Prosecutors introduced evidence that McFall later communicated to Golden State representatives that he could deliver Bedford's vote in favor of their development proposals if they paid McFall between $50,000 and $100,000. The indictment charged that this conduct amounted to attempted extortion under color of official right in violation of the Hobbs Act.

*The Digital Angel Corporation Scheme (Count 14)*

In late 2001, the state OCJP awarded a $400,000 grant to the Digital Angel Corporation ("Digital Angel") to fund a pilot project whereby the California Department of Corrections would utilize the company's electronic tracking devices. In January 2002, Sawyer (then Chief Deputy Director of OCJP) and McFall met with Robert Levy, a lobbyist for Digital Angel, in Sacramento to discuss potential collaboration. Digital Angel was seeking additional funding from OCJP, and Sawyer indicated that McFall could be of assistance.

A few weeks after the meeting, Levy received a draft memorandum of understanding ("MOU") from McFall's daughter proposing an agreement between Digital Angel's parent company and the Stagecoach Corporation (an entity McFall created and controlled). Under the proposed MOU, Digital Angel would pay a $100,000 fee to a consultant that Stagecoach would later name. Levy complained about the agreement to Sawyer, who urged him to work with McFall and, according to Levy, stated that OCJP funding would not materialize without McFall's help. Digital Angel did not agree to the terms of the MOU and had no further dealings with McFall. The indictment charged that McFall's and Sawyer's conduct amounted to conspiracy to commit extortion under color of official right in violation of the Hobbs Act.

*Post-Trial Proceedings*

McFall dismissed his trial counsel after the defense rested its case, and delivered closing argument on his own behalf. After his conviction, McFall retained new counsel, who promptly filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. The district court held a two-day evidentiary hearing on the motion for a new trial, and denied the motion on July 20, 2006. McFall timely appealed.

### DISCUSSION

I. *Sufficiency of the Evidence on Counts 2, 3, and 4*

McFall contends that the evidence presented at trial is insufficient to support his conviction on Counts 2, 3, and 4.[4] In reviewing the sufficiency of the evidence on appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We review the district court's interpretation of the applicable statute, in this case the Hobbs Act, 18 U.S.C. § 1951, de novo. *See United States v. Brannan*, 898 F.2d 107, 109 (9th Cir. 1990).

[1] The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). McFall was charged under an "official right" theory of extortion. The government contended that he and his collaborators manufactured political opposition to a pending Calpine project in order to coerce the company into withdrawing its bid to build a power plant at the Port of Stockton.[5] According to the government, McFall sought to "obtain"—a term the statute does not define — Calpine's property interest in bidding for the right to built a power plant at the Port of Stockton for Sunlaw, his client.

---

[4]McFall also challenges the jury instructions on Counts 2, 3, and 4. His argument substantially tracks his sufficiency of the evidence contention, and finding that contention meritorious, we do not reach the jury instruction question.

[5]The Hobbs Act criminalizes two distinct modes of extortion. The first relates to the obtaining of property from another, with his or her consent, through the "wrongful use of actual or threatened force, violence, or fear," and the second relates to the obtaining of property "under color of official right." 18 U.S.C. § 1951(b)(2); *see Evans v. United States*, 504 U.S. 255, 261-62 (1992).

**[2]** We have stated that Hobbs Act extortion is a "larceny-type offense," which "does not occur when a victim is merely forced to part with property." *United States v. Panaro*, 266 F.3d 939, 943 (9th Cir. 2001). Instead, "there must be an 'obtaining': someone — either the extortioner or a third person — must receive the property of which the victim is deprived." *Id.* In *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 397 (2003), the Supreme Court reached the same conclusion, holding that anti-abortion protesters who obstructed access to abortion clinics did not obtain the clinics' property within the meaning of the Hobbs Act. The Court explained that the Hobbs Act's obtaining element requires a showing that a defendant received "something of value" from the victim of the alleged extortion, and that the "thing of value" can be exercised, transferred or sold. Thus, conduct that "merely interfere[s] with or depriv[es] someone of property" is not sufficient, standing alone, to constitute Hobbs Act extortion. *Id.*[6]

McFall argues that the government did not prove — or even allege — that he attempted to obtain Calpine's property within the meaning of the Hobbs Act. The indictment charged McFall and his collaborators with "attempt[ing] to obtain from Calpine Corporation a financial benefit not due any of them, that is, its right to solicit business in San Joaquin County, to bid on the construction of a power plant and to construct a power plant at the Port of Stockton." In essence, McFall argues, the government charged him with employing coercion to derail Calpine's bid to build a power plant at the Port of Stockton, thereby *increasing* the probability, at least

_____

[6]The Court noted that extortion, stripped of an obtaining requirement, really amounts to the lesser crime of coercion, *i.e.*, "the use of force or threat of force to restrict another's freedom of action." *Scheidler*, 537 U.S. at 405. Because Congress modeled the Hobbs Act on New York's extortion statute and the 19th Century Field Code, both of which contained the lesser crime of coercion at the time of the act's passage, the Court presumed that Congress did not intend to blur the extortion/coercion distinction. *See id.* at 403, 405-08.

theoretically, that Sunlaw would secure the right to build the plant at the contested site.

**[3]** We agree that decreasing a competitor's chance of winning a contract, standing alone, does not amount to *obtaining* a transferable asset for oneself (or one's client). Neither Calpine nor Sunlaw had a vested right to build at the contested site, and there was no guarantee that either company would secure such a right. The district court concluded that McFall's "improper attempt to secure a business advantage" satisfied the Hobbs Act's obtaining element, but this formulation fails to account for *Scheidler*'s principal point: To violate the Hobbs Act, an alleged extortionist must actually appropriate (or attempt to appropriate) the victim's property such that it can be exercised, transferred or sold. *Id.* at 405. It is not enough to gain some speculative benefit by hindering a competitor.

Moreover, *Schiedler* made clear that the rule of lenity applies to ambiguous applications of the Hobbs Act. *Id.* at 408-09; *see also United States v. Enmons*, 410 U.S. 396, 411 (1973). Thus, even if a coherent argument could be made that attempting to thwart Calpine's bid to build a plant at the Port of Stockton amounted to an attempt to "obtain" an increased probability of winning a right to build for Sunlaw, we must resolve the ambiguity in favor of McFall. *See McNally v. United States*, 483 U.S. 350, 359-60 (1987) ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.").

The government stresses that *Scheidler* expressly left intact a lower court decision assigning an expansive definition to the term "property" as used in the act. *See* 537 U.S. at 402 n.6 (explaining that the holding does not disturb the Second Circuit's decision in *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969), where the court "concluded that the intangible right to solicit refuse collection accounts consti-

tuted property within the Hobbs Act definition") (internal quotation marks omitted). *Tropiano*, however, does not help the government to satisfy the Hobbs Act's obtaining element. Even assuming that the intangible right to bid on a power plant site constitutes property for Hobbs Act purposes, the government must establish that McFall attempted to acquire that property right such that he alone could sell, transfer, or exercise it. *Cf. United States v. Gotti*, 459 F.3d 296, 323 (2d Cir. 2006) (holding that *Schiedler* effected a general tightening of the Hobbs Act's obtaining requirement, but did not undermine Second Circuit precedent holding that intangible property rights can qualify as "extortable property").[7] Even assuming that the right to submit a bid is property within the meaning of the Hobbs Act, McFall did not, and indeed could not, attempt to exercise Calpine's right to submit a bid. Instead, according to the evidence introduced at trial, he sought to increase Sunlaw's odds of prevailing on its own bid by restricting the activities of a competitor — conduct that cannot amount to obtaining under *Scheidler*.

**[4]** Because the evidence did not establish, nor did the indictment allege, that McFall obtained or attempted to obtain any property or intangible right from Calpine, we conclude

---

[7]In approving of *Tropiano*'s broad definition of extortable property, but simultaneously imposing a stringent "obtaining requirement," *Schiedler* created considerable tension in the caselaw. For example, in *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980), we concluded that "[t]he right to solicit business free from wrongful coercion is a protected property right." But could an extortionist ever "obtain" that right after *Schiedler*? *See* Matthew T. Grady, *Extortion May No Longer Mean Extortion After* Scheidler v. National Organization for Women, Inc., 81 N.D. L. REV. 33, 61-62 (2005) (arguing that *Scheidler* effectively held that intangible rights are not property under the Hobbs Act, because such rights are incapable of being obtained or captured); *but see Gotti*, 459 F.3d at 323 ("We therefore read [*Scheidler*] as leaving intact [Second Circuit] precedent that intangible property rights can qualify as extortable property under the Hobbs Act and as simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question.").

that the evidence is insufficient to sustain a conviction under Counts 2, 3, and 4, and reverse the conviction on those counts.

## II.  *Count 11 Jury Instruction*

McFall argues that the district court's jury instruction on Count 11 omitted a necessary element of the offense. We review de novo whether jury instructions accurately state the elements of a statutory crime. *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000).

McFall contends that the district court erred in failing to instruct the jury that a finding of aiding and abetting Supervisor Bedford, or conspiring with him, was necessary to convict McFall of attempted extortion under claim of official right. The district court gave the following instruction on Count 11:

> [T]he defendant is charged with attempting to extort Golden State Developers in connection with a project in San Joaquin County in or about mid-August 2001. In order for the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt. First, that Lynn Bedford was a public official. Second, that the defendant attempted to obtain property in return for the taking or withholding of some official action by Lynn Bedford. Third, that the defendant attempted to obtain property to which he knew he was not entitled. Fourth, commerce or the movement of an article or commodity in commerce from one state to another would have been affected in some way. And fifth, the defendant did something that was a substantial step toward committing the crime of attempted extortion, with all of you agreeing as to what constituted a substantial step.

**[5]** As the Seventh Circuit has explained, "as a general matter . . . proceeding against private citizens on an 'official right' theory is inappropriate under the literal and historical meaning of the Hobbs Act, irrespective of the actual 'control' that citizen purports to maintain over governmental activity." *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991); *see also United States v. Freeman*, 6 F.3d 586, 592 (9th Cir. 1993) (noting that the majority of Hobbs Act cases arising under an "official right" theory involve prosecutions of elected or appointed officials).[8] Following the other circuits that have addressed the issue, the Sixth Circuit has held that "a private citizen who is not in the process of becoming a public official may be convicted of Hobbs Act extortion under a 'color of official right' theory only if that private citizen either conspires with, or aids and abets, a public official in the act of extortion." *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *accord United States v. Tomblin*, 46 F. 3d 1369, 1382 (5th Cir. 1995) (noting that every decision upholding a private citizen's Hobbs Act conviction under an official right theory "involved a public official in some past, present, or future capacity receiving money"); *United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir.1982) (affirming a private citizen's Hobbs Act conviction where the defendant aided and abetted a public official's extortion), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987).

---

[8]The standard is slightly different where a public employee purports to have powers beyond the scope of his or her actual authority. *See Freeman*, 6 F.3d at 593 ("[W]e conclude that the Hobbs Act reaches those *public employees* who may lack the actual power to bring about official action, but create the reasonable impression that they do possess such power and seek to exploit that impression to induce payments.") (emphasis added). McFall's position as a Water Reclamation Board Trustee is not related to the charges underlying Count 11, and the government does not contend that McFall acted as a public employee in any of his dealings with Golden State.

McFall himself made no claim of official right. He claimed to have outsized political influence, but did not represent himself to Golden State representatives as a public official or as an employee or agent of a public official. McFall's criminal act was, according to the government's theory, his claim that he had significant influence over Bedford, and could affect his votes on matters of importance to Golden State if the company's representatives paid McFall — not Bedford — between $50,000 and $100,000.

The Sixth Circuit's decision in *Saadey* is closely on point. In *Saadey*, the government charged a private citizen with Hobbs Act extortion under an official right theory, alleging that the defendant attempted to solicit money under the "pretense" that the money would be used to bribe an uncharged public official. *Saadey*, 393 F.3d at 675-76. The public official had been acquitted on all charges of conspiracy, and the government did not offer evidence indicating that he had knowledge of the defendant's scheme. *Id.* at 676. Because the district court "refused to charge the jury on the issue of aiding and abetting," the Sixth Circuit determined that the defendant's Hobbs Act conviction could not stand. *Id.*

The government relies on our decision in *Freeman*, which upheld an extortion under claim of official right conviction against a legislative aide that represented himself as a proxy for his boss, a state assemblywoman. *See Freeman*, 6 F.3d at 593. *Freeman*, however, cannot bear the weight the government ascribes to it. The holding reaches only the conduct of government officials that "actually exercise[ ] official powers," even if those powers correspond to an un-elected and un-appointed position. *Id.*

Alternatively, the government argues that the district court's articulation of the second element of the offense encompasses aiding and abetting. The instruction described that element as requiring a finding that McFall "attempted to obtain property in return for the taking or withholding of

some official action by Lynn Bedford." That articulation, however, does not require a finding that Bedford himself attempted to extort money from Golden State (which would necessarily include a finding that Bedford himself possessed the requisite criminal intent).[9] *See United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997) ("The elements necessary to convict an individual under an aiding and abetting theory are (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense."). In other words, the jury could have interpreted the instruction as requiring no more than a *claim* that Bedford would act in a certain way if a bribe was paid to McFall, regardless of whether Bedford himself intended to extort funds from Golden State, or was even aware of McFall's scheme.

The district court, in denying McFall's motion for a new trial, concluded that a private individual may be prosecuted under an official right theory of Hobbs Act liability if the individual "parades his control or influence over a public official in alleged concert with such official." The court's statement is supportable as far as it goes, but fails to acknowledge that the jury was not instructed on the issue of whether McFall actually acted "in concert" with Bedford to extort funds from Golden State.

**[6]** We hold that the district court erred in failing to give an aiding and abetting or conspiracy instruction to the jury on Count 11. As instructed, the jury could have concluded that McFall's claims of influence over Bedford were gross exag-

---

[9]The Supreme Court has held that a public official commits Hobbs Act extortion when he "obtain[s] a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268.

gerations, and still convicted him of attempted extortion under claim of official right. The Hobbs Act does not sweep so broadly.

Because we conclude that the jury instruction on Count 11 omitted a necessary element of the offense, we must consider whether that error was harmless. *See Neder v. United States*, 527 U.S. 1, 9 (1999). The test for harmlessness is whether "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 15 (internal quotation marks omitted).

**[7]** We are unable to conclude that the instructional error was harmless. In their argument to the jury, the prosecutors stressed that a guilty verdict was necessary if the jury concluded that McFall attempted to trade his influence over Bedford for a cash payment. The government's basic theory, as represented in the jury instructions and arguments before the jury, was based on an improper broadening of the Hobbs Act. The evidence in the record did not clearly establish that Bedford aided and abetted or conspired with McFall to extort money from Golden State; thus, we cannot say beyond a reasonable doubt that the error did not contribute to the verdict — that the jury would have reached the same conclusion had it been properly instructed. We therefore reverse the Count 11 conviction.

III.   *Suppression of Exculpatory Grand Jury Testimony*

McFall contends that the district court erred in not admitting a transcript of Sawyer's grand jury testimony, and that the error was prejudicial because the testimony offered a first-person account of the key events at issue in Count 14 that contradicts the testimony of the government's primary witness. The court cited two alternative bases for excluding the grand jury testimony: (1) the transcript amounted to inadmissible hearsay; and (2) the transcript would unfairly prejudice the government because the jury would not be informed of

Sawyer's indictment on perjury charges or his guilty plea to the crime of honest services mail fraud, a felony. We review the district court's evidentiary rulings for abuse of discretion. *Hoffman v. Constr. Prot. Servs., Inc.*, 541 F.3d 1175, 1178 (9th Cir. 2008).

McFall was initially indicted in October 2002. Sawyer, at that point uncharged, appeared before a grand jury on November 13, 2002. His testimony resulted in a 120-page transcript, a substantial portion of which is devoted to the events underlying the charges in Count 14 (*i.e.*, the scheme to extort money from Digital Angel). Sawyer was indicted more than a year later, in December 2003.

An independent review of Sawyer's grand jury testimony makes clear that the transcript's exclusion prejudiced McFall at trial. Levy, the Digital Angel lobbyist, testified that Sawyer made extortionate threats on McFall's behalf during a telephone conversation to which Levy and Sawyer were the only parties. Sawyer testified that the notion that he and McFall conspired to deny state grant funds to Digital Angel unless the company paid a consulting fee to McFall's daughter — the crux of the charge against McFall — was "ridiculous." According to one of the prosecutor's notes, Sawyer stuck to this version of events in his post-plea debriefing. As a result of the grand jury testimony's exclusion (and Sawyer's Fifth Amendment invocation at McFall's trial), the jury heard only two versions of the disputed events — Levy's and McFall's. Sawyer's excluded grand jury testimony would have largely corroborated McFall's account.

Even so, Sawyer's grand jury testimony represents an out of court statement offered to prove the truth of the matter asserted, and as such is hearsay. *See* Fed. R. Evid. 801(c). At trial, McFall invoked the hearsay exception laid out in Federal Rule of Evidence 804(b)(1), which allows admission of the former testimony of an "unavailable" witness. *See* Fed. R. Evid. 804(a). The exception provides:

> Testimony given as a witness at another hearing of
> the same or a different proceeding, or in a deposition
> taken in compliance with law in the course of the
> same or another proceeding [is admissible], if the
> party against whom the testimony is now offered . . .
> had an opportunity and similar motive to develop the
> testimony by direct, cross, or redirect examination.

Fed. R. Evid. 804(b)(1).

It is clear that Sawyer, having invoked his Fifth Amendment right not to testify after being subpoenaed by McFall, was "unavailable" as a witness, at least to McFall. *See Padilla v. Terhune*, 309 F.3d 614, 618 (9th Cir. 2002). Further, the Rule 804(b)(1) hearsay exception can, in some circumstances, encompass grand jury testimony. *See, e.g.*, *United States v. Salerno*, 505 U.S. 317, 325 (1992); *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984). The question is whether the government's motive in examining Sawyer before the grand jury was sufficiently similar to what its motive would be in challenging his testimony at McFall's trial. Prosecutors need not have pursued every opportunity to question Sawyer before the grand jury; the exception requires only that they possessed the motive to do so. *See United States v. Geiger*, 263 F.3d 1034, 1039 (9th Cir. 2001).

**[8]** In *Salerno*, the Supreme Court considered the admissibility of grand jury testimony under Rule 804(b)(1). The Court held that Rule 804(b)(1)'s "similar motive" prong is a fact-intensive one, dependent on the particular circumstances of the case. *Salerno*, 505 U.S. at 325; *Geiger*, 263 F.3d at 1038 ("The 'similar motive' requirement is inherently factual and depends, at least in part, on the operative facts and legal issues and on the context of the proceeding.").

The district court concluded that the government's motivation in examining Sawyer before the grand jury was not at all similar to its hypothetical motivation in examining him at

McFall's trial. The court stated the following subsidiary findings in support of its conclusion:

> [A]t the time Mr. Sawyer was before the Grand Jury, it was a fact-finding investigation. It was not an adversarial proceeding, notwithstanding the fact that the government's attorneys did in fact question Mr. Sawyer before the Grand Jury. Two, the Court makes a factual finding that Mr. Sawyer was not a suspect at the time of his testimony. It was over a year later that he was actually indicted . . . . The Court makes a further factual finding that the motive for obtaining Mr. Sawyer's testimony before the Grand Jury was completely different from what it would be today. Five, the Court makes a further finding that Mr. Sawyer is in fact a person who has entered a plea of guilty to a felony, which would not be able to be brought before the jury at this time if his testimony were simply read to the jury. And the final factual finding is that Mr. Sawyer, his testimony at the time that he was before the Grand Jury, is now at least the subject of an indictment for his own perjury before that very Grand Jury.

**[9]** As a threshold matter, we must determine at what level of generality the government's respective motives should be compared, an issue that has divided the circuits. *See* 2 MCCORMICK ON EVID. § 304 (6th ed. 2006) (noting that the circuits appear to be in disagreement over "whether in typical grand jury situations exculpatory testimony meets" Rule 804(b)(1)'s similar motive requirement). In *United States v. Miller*, 904 F.2d 65, 68 (D.C. Cir. 1990), the D.C. Circuit compared the government's respective motives at a high level of generality. The *Miller* Court concluded that "[b]efore the grand jury and at trial" the testimony of an unavailable co-conspirator "was to be directed to the same issue — the guilt or innocence" of the defendants, and thus, the government's motives were sufficiently similar. *Id.; accord United States v.*

*Foster*, 128 F.3d 949, 957 (6th Cir. 1997) (citing *Miller* with approval). McFall's trial counsel made a similar argument before the district court, contending that the government's primary goal in questioning Sawyer before the grand jury was to incriminate McFall. At trial, the government's motivation would, of course, have been the same.

In *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc), in contrast, the Second Circuit required comparison of motives at a fine-grained level of particularity.[10] *See id.* at 912 ("[W]e do not accept the proposition . . . that the test of similar motive is simply whether at the two proceedings the questioner takes the same side of the same issue."); *see id.* (stating that the proper test for similarity of motive is whether the questioner had "a substantially similar *degree of interest* in prevailing" on the related issues at both proceedings) (emphasis added); *accord United States v. Omar*, 104 F.3d 519, 522-24 (1st Cir. 1997) (concluding that the government will rarely have a similar motive in questioning a witness before a grand jury as it would have at trial).

The *DiNapoli* Court focused on three factors that distinguished the government's degree of motivation in examining the witness before the grand jury from its motivation at trial. 8 F.3d at 915. First, at the time of the grand jury testimony, the defendants in *DiNapoli* had already been indicted, and thus the government did not necessarily have a strong incentive to pursue testimony that would incriminate them. *Id.* Second, the grand jurors, as a group, had already indicated to the prosecutor that they did not believe the witnesses' testimony, diminishing the need to pursue impeaching lines of questioning. *Id.* Finally, the court concluded that prosecutors had declined to impeach some of the statements before the grand jury that they knew to be false in order to avoid disclosing

---

[10]The *DiNapoli* opinion issued after the Supreme Court reversed and remanded the Second Circuit's judgment in *Salerno. DiNapoli*, 8 F.3d at 912.

secret evidence (*i.e.*, facts gleaned from undisclosed wiretaps and informers). *Id.*

The government's motivation in questioning Sawyer before the grand jury was likely not as intense as it would have been at trial, both because it had already indicted McFall, and because the standard of proof for obtaining a conviction is much higher than the standard for securing an indictment. *See id.* at 913. We cannot agree, however, with the Second Circuit's gloss on Rule 804(b)(1). As one of the dissenters in *DiNapoli* (an en banc decision) noted, the requirement of similar "intensity" of motivation conflicts with the rule's plain language, which requires "similar" but not identical motivation. *Id.* at 916 (Pratt, J., dissenting); *Geiger*, 263 F.3d at 1038 (" 'Similar motive' does not mean 'identical motive.' ") (quoting *Salerno*, 505 U.S. at 326 (Blackmun, J., concurring)); *see also Salerno*, 505 U.S. at 328-29 (Stevens, J., dissenting) ("[A] party has a motive to cross-examine any witness who, in her estimation, is giving false or inaccurate testimony about a fact that is material to the legal question at issue in the proceeding.").

**[10]** On balance, we agree with the D.C. Circuit's elaboration of the "similar motive" test and conclude that the government's fundamental objective in questioning Sawyer before the grand jury was to draw out testimony that would support its theory that McFall conspired with Sawyer to commit extortion — the same motive it possessed at trial. That motive may not have been as intense before the grand jury, but Rule 804(b)(1) does not require an identical quantum of motivation. Although McFall had already been indicted when Sawyer appeared before the grand jury, prosecutors did not obtain the final superseding indictment (which brought the total number of counts against McFall to twenty) until September 9, 2004, almost two years after Sawyer appeared before the grand jury. Moreover, Count 14 is a conspiracy charge, and thus depends on proof that McFall and Sawyer cooperated in a scheme to extort money from Digital Angel, providing pros-

ecutors with ample incentive to develop testimony that would incriminate McFall.

The district court, therefore, erred in concluding that the government's respective motives were "completely different," and the exclusion of Sawyer's grand jury testimony as hearsay amounted to an abuse of discretion.

The district court's alternative Rule 403 basis for excluding the evidence also amounts to an abuse of discretion. *See* Fed. R. Evid. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). First, the district court appears to have given no consideration to the probative value of Sawyer's testimony, a crucial element of the balancing test that Rule 403 requires. *See Old Chief v. United States*, 519 U.S. 172, 182-83 (1997). Second, the district court erroneously concluded that evidence that Sawyer had been indicted for perjury and that he pleaded guilty to the crime of honest services mail fraud would be inadmissible at trial. Evidence that Sawyer perjured himself (along with evidence of his felony mail fraud conviction) could have been admitted at trial to impeach the credibility of his grand jury testimony pursuant to FRE 806. *United States v. Becerra*, 992 F.2d 960, 965 (9th Cir.1993) ("Federal Rule of Evidence 806 permits attacks on the credibility of the declarant of a hearsay statement as if the declarant had testified.").

Moreover, the unique circumstances of this case present an additional reason why the district court's refusal to permit McFall to introduce Sawyer's grand jury testimony was an abuse of discretion. Under Sawyer's plea agreement, the government had the right to require Sawyer to testify pursuant to the agreement's cooperation clause. Thus, Sawyer was unavailable only to the defendant, McFall. Once Sawyer's grand jury testimony was read to the jury, the government

could have called Sawyer in its rebuttal case to testify and pursued whatever line of impeachment or any other legitimate line of questioning it desired.[11]

[11] In sum, the probative value of the grand jury testimony was very high, and the potential for unfair prejudice, given the government's ability to impeach under Rule 806 or even to call Sawyer as a witness, was substantially lower than the district court presumed. The district court thus abused its discretion in excluding Sawyer's grand jury testimony as unduly prejudicial under Rule 403. We reverse the Count 14 conviction.

## CONCLUSION

For the reasons set forth above, we **REVERSE** McFall's conviction on Counts 2, 3, 4, 11, and 14. Because we reverse on five of the seventeen counts of which McFall was convicted, we vacate the sentence and **REMAND** for further proceedings on those five counts[12] and for resentencing on the remaining 12 counts. For the reasons set forth in our concurrently filed memorandum, we **AFFIRM** McFall's conviction as to the remaining 12 counts.

[11]At Sawyer's sentencing hearing, prosecutors moved for a U.S.S.G. § 5K1.1 downward sentencing departure; a departure that prosecutors may, in their discretion, recommend where a cooperating witness provides "substantial assistance." *See United States v. Ming He*, 94 F.3d 782, 787-88 (2d Cir. 1996) (explaining the function of U.S.S.G § 5K1.1). That the government endorsed Sawyer's post-plea cooperation — which included his continued denial of wrongdoing with respect to the events at issue in Count 14 — after a formal debriefing, undercuts its contention on appeal that Sawyer's testimony before the grand jury was unreliable and misleading.

[12]Because we reverse for insufficiency of the evidence on Counts 2, 3, and 4, McFall cannot again be put in jeopardy on those charges. Those counts therefore should be dismissed. *See Burks v. United States*, 437 U.S. 1, 11 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.").