# United States Court of Appeals
### For the Eighth Circuit
_____

No. 23-1212
_____

United States of America

*Plaintiff - Appellee*

v.

Keith Deshon Euring, Sr., also known as Sweat

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: January 9, 2024
Filed: August 12, 2024
_____

Before SMITH, Chief Judge,[1] GRUENDER and SHEPHERD, Circuit Judges.
_____

SMITH, Chief Judge.

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

Keith Euring, Sr., appeals his conviction for sex trafficking of a child, in violation of 18 U.S.C. § 1591(a)(1). He challenges certain of the district court's[2] evidentiary rulings as well as the sufficiency of the evidence. We affirm.

I. *Background*

In November 2018, 16-year-old S.G. was reported missing. The next day, she showed up at her Iowa high school. The school resource officer, Matthew Poirier, interviewed her and noticed that she seemed intoxicated. She told him that she had spent the weekend in Chicago at "Sweat's" father's home and had made $2,000 packaging cocaine; she later said that she had made $6,000 to $7,000. S.G. told Poirier that "Sweat" had given her money and offered to take her to Chicago so she could provide for herself. She said she had refused to go to Chicago to have sexual encounters. S.G. also denied having sex with "Sweat" and said that she would never do so. Initially, she said that the previous weekend was her first trip to Chicago with "Sweat," but then she admitted that she had also been there the weekend before. She described three dates she had been on during that first weekend and the amount of money she had earned on each. S.G. first recounted earning a total of $1,500 and then said she earned $1,700, of which $200 went to "Sweat." But she denied engaging in any sex acts during those dates. She reported that during the second trip to Chicago, she used cocaine and either lost her memory or became unconscious. She described being held captive by two Middle Eastern men, escaping through a window, and taking two Uber rides to get home.

Based on this interview, Poirier presented S.G. with a photo lineup. That lineup did not include Euring's picture, and S.G. did not make an identification. That afternoon, after running a search on the phone number associated with "Sweat," police prepared a second photo lineup. This time, S.G. identified Euring's photo as a photo of "Sweat."

---

[2]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

S.G.'s later statements to medical personnel and police contained additional details, some of which were inconsistent with her original account to Poirier. For example, her written statement said that she had given Euring $500 of the $1,700 she earned, rather than $200. Additionally, she wrote that Euring had paid her $600 for sex, despite previously denying that she had sex with him.

Law enforcement officers continued investigating. They searched S.G.'s phone and obtained records from her service provider. They learned that, in October 2018, someone had created a profile for S.G. on a dating site, and S.G. had thereafter communicated with men she connected with through the site. Her phone contained recordings of a male voice stating some of the contents of her profile. S.G. later identified the voice as Euring's and said that she thought she made the recordings to remember what he said. S.G.'s profile stated that she "offer[ed] massages and happy endings."[3] R. Doc. 121, at 49. Hotel and car rental records also supported law enforcement's theory that Euring had taken S.G. to Chicago. The investigation established that S.G.'s earlier statements about escaping a captive situation were false. In fact, S.G. had ended the second weekend in Chicago by spending a few days with a Dr. Muhammad Ali, someone she had previously met, and it was Dr. Ali, not Uber drivers, who had brought her back to Iowa.

The government sought an indictment against Euring. Before the grand jury, the government called Dr. Ali and some of S.G.'s clients to testify. The government offered immunity to some witnesses, but not to Dr. Ali. The grand jury indicted Euring for sex trafficking of a child (Count One), transportation of a minor with intent that the minor engage in criminal sexual activity (Count Two), use of interstate commerce to facilitate prostitution (Count Three), and distribution of marijuana to a person under age 21 (Count Four).

---

[3]One client later testified that he understood this phrase to mean a massage with masturbation.

At trial, the government called four men who had been S.G.'s clients. One testified that he had paid S.G., she had massaged him, and she had masturbated him. Another client testified that he believed he had engaged in oral sex with S.G. in exchange for money. The government also introduced into evidence cell phone location data suggesting that S.G. and Euring had traveled to Chicago together on the two weekends in question. Phone records showed that they had been in the same area and had communicated while she was with clients.

S.G. testified that Euring suggested that she make money by going on dates in Chicago and told her that she could make more money by performing sexual acts. She said that Euring created an advertisement for her on a dating website and helped her set up a profile. She also testified that Euring made two weekend trips to Chicago with her, booked a hotel room, communicated with clients, took her to and from appointments with clients, and split her earnings 50–50. She testified that she engaged in sex with clients in exchange for money. She also said that she engaged in oral sex with a client.

On cross-examination, the defense confronted S.G. with multiple inconsistent statements she had previously made. In four instances, she asked defense counsel if she could explain her prior statement, without first admitting that she had made the statement. The defense never allowed her to explain her prior statements. S.G. did admit to making one of those four prior statements. In two additional instances, she asked to be allowed to explain a prior statement she made while testifying. The defense again refused. But on redirect, the government gave her the opportunity to explain some of her prior testimony as well as some of her prior inconsistent statements.

The government moved to prevent the defense from introducing extrinsic evidence of S.G.'s prior inconsistent statements. The court ruled that it would admit extrinsic evidence of S.G.'s prior statements to impeach her denials or recollection failures *unless* she had also asked to explain herself and been denied the opportunity to do so. For any series of questions in which S.G. had asked to explain herself, the

court would not allow extrinsic evidence of inconsistent statements. The defense called Poirier as a witness and asked him about some of S.G.'s prior inconsistent statements. At closing argument, the court allowed the defense to argue for a negative inference from S.G.'s memory lapses, thus treating them as admissions that she had made the statements she could no longer remember.

Prior to trial, the defense had failed to find Dr. Ali, and it appeared that he may have left the country. At trial, the defense sought to introduce the transcript of Dr. Ali's grand-jury testimony under Federal Rule of Evidence 804(b)(1). The defense argued that Dr. Ali was unavailable and that the government had the same motive to develop his testimony before the grand jury as at trial. The government objected, arguing that it did not have a similar motive because at the time of Dr. Ali's grand-jury testimony S.G. had not yet told investigators anything about Dr. Ali.[4] The government also argued that Dr. Ali's grand-jury testimony was almost entirely untrue.

The district court found that the government did not have a similar motive to examine Dr. Ali because the grand jury met during an early stage of the investigation. Furthermore, because the grand-jury testimony contained no "indicia of reliability," the court determined that the government would have intensely cross-examined Dr. Ali at trial. R. Doc. 148, at 9 (Sealed). Thus, the court did not admit the transcript.

At the close of the evidence, Euring moved for a judgment of acquittal. The district court denied the motion. The jury found Euring guilty on Count One, sex trafficking of a child, and Count Four, distribution of marijuana to a person under

---

[4]On the eve of trial, S.G. reported that Dr. Ali forced her to use cocaine, tied her hands, and refused to let her leave.

age 21. It acquitted him on Count Two and could not reach a verdict on Count Three. Euring appeals.[5]

## II. *Discussion*

Euring raises three issues on appeal. First, he argues that the district court should have admitted the transcript of Dr. Ali's grand-jury testimony. Second, he argues that the court should have permitted him to introduce extrinsic evidence of S.G.'s inconsistent statements even when he denied S.G. the opportunity to explain her statements. Third, Euring argues that the evidence was insufficient because it did not show that he "knew or recklessly disregarded that S.G. would engage in a commercial sex act." Appellant's Br. at 27.

### A. *Evidentiary Rulings*

We review a district court's ruling on the admissibility of evidence—and its underlying factual findings—for an abuse of discretion. *United States v. Dunn*, 76 F.4th 1062, 1066 (8th Cir. 2023); *United States v. Smith*, 383 F.3d 700, 706 (8th Cir. 2004). But we review de novo the court's construction of the Federal Rules of Evidence. *Smith*, 383 F.3d at 706.

### 1. *Dr. Ali's Grand-Jury Testimony*

Euring argues that the court should have admitted Dr. Ali's grand-jury testimony under Rule 804(b)(1). He contends that Dr. Ali's testimony was crucial to the defense because Dr. Ali's relationship with S.G. predated the alleged trafficking; Dr. Ali did not meet S.G. through the dating profile that Euring allegedly helped to create, but rather through a different dating website; and S.G. spent three days at Dr. Ali's home during one of the trips when Euring allegedly trafficked her. And Euring argues that Dr. Ali's grand-jury testimony should have been admitted because Dr.

---

[5]Euring conceded his guilt on Count Four, and he does not ask us to reverse this conviction.

Ali was unavailable at trial and the government had a similar motive to cross-examine him before the grand jury, as Euring was the target of that proceeding.

> The prior testimony of an unavailable witness is admissible if it
>
> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1); *see also United States v. Salerno*, 505 U.S. 317, 321–24 (1992) (holding that the "similar motive" requirement applies when a criminal defendant seeks to introduce the prior grand-jury testimony of an unavailable witness). We assume, as did the district court, that Dr. Ali was unavailable within the meaning of Rule 804(a), and we likewise assume that the government had a prior opportunity to develop Dr. Ali's testimony. We consider only whether the government had a similar motive to develop Dr. Ali's testimony. This "is inherently a *factual* inquiry." *Salerno*, 505 U.S. at 326 (Blackmun, J., concurring); *see also United States v. DiNapoli*, 8 F.3d 909, 914 (2d Cir. 1993) (en banc) ("[T]he inquiry as to similar motive must be fact specific . . . .").

Our circuit has compared motives case-by-case.[6] But we have not previously prescribed an analytical rubric for determining the presence of a similar motive for the admission of prior testimony of an unavailable witness.

---

[6]*See United States v. Preciado*, 336 F.3d 739, 746 (8th Cir. 2003) (holding that the government's motive to develop one criminal defendant's testimony at his plea hearing was not similar to the government's motive to develop testimony at a different defendant's trial); *Azalea Fleet, Inc. v. Dreyfus Supply & Mach. Corp.*, 782 F.2d 1455, 1461 (8th Cir. 1986) (holding that two different defendants in two different civil actions arising from the same incident had a similar motive to develop a witness's testimony as to liability); *Hannah v. City of Overland*, 795 F.2d 1385, 1390–91 (8th Cir. 1986) (holding that a prosecutor's motive in questioning two deponents as part of a criminal proceeding was not similar to the motive of the

The Ninth Circuit considers similar motive "at a high level of generality." *United States v. McFall*, 558 F.3d 951, 962 (9th Cir. 2009). It focuses on "the government's fundamental objective." *Id.* at 963. In *McFall*, the Ninth Circuit held that a grand-jury transcript should have been admitted because "the government's fundamental objective in questioning [the witness] before the grand jury was to draw out testimony that would support its theory that [the defendant] conspired with [the witness] to commit extortion—the same motive it possessed at trial." *Id.*[7]

By contrast, the Second Circuit considers whether the government "had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." *DiNapoli*, 8 F.3d at 914–15. In *DiNapoli*, the Second Circuit noted that "the low burden of proof at the grand jury stage" and the "public interest in not disclosing prematurely the existence of surveillance techniques" could serve to distinguish the government's motive to develop grand-jury testimony from its motive at trial. *Id.* at 913. The court, however, declined to say that the government's motive will generally be dissimilar. *Id.* at 914.

---

defendants in a plaintiff's civil action for wrongful arrest), *abrogated on other grounds by Green v. Bock Laundry Mach. Co.*, 490 U.S. 504 (1989); *DeLuryea v. Winthrop Lab'ys*, 697 F.2d 222, 226–27 (8th Cir. 1983) (holding that a prior deposition of the plaintiff's doctor in a workers' compensation case should have been admitted against the plaintiff in her suit against a drug manufacturer).

[7]*See also United States v. Foster*, 128 F.3d 949, 955–56 (6th Cir. 1997) (holding that grand-jury testimony should have been admitted when the government had the opportunity "to strenuously question [the unavailable witness] during his grand jury testimony" and the "testimony could have had a significant impact on the jury's verdict"); *United States v. Miller*, 904 F.2d 65, 68 (D.C. Cir. 1990) ("[T]he government had the same motive and opportunity to question [the witness] when it brought him before the grand jury as it [did] at trial. Before the grand jury and at trial, [the witness's] testimony was to be directed to the same issue—the guilt or innocence of [the defendants]." (citations omitted)).

Instead, it described the question as factual. *Id.* The court also stated that the cross-examination undertaken and forgone was relevant, but not conclusive. *Id.* at 915.[8]

We hold that a party seeking the admission of prior testimony must show that the other party's motive at the time of the prior testimony was substantially similar in both scope and intensity to the motive at the time of trial. But the court need not "compar[e] [the two] motives at a fine-grained level of particularity." *McFall*, 558 F.3d at 962. The question of similarity is inherently factual, *Salerno*, 505 U.S. at 326 (Blackmun, J., concurring), and thus not conducive to general rules, *see DiNapoli*, 8 F.3d at 914. A court may consider, among other factors, the purpose of the prior proceeding, *see DeLuryea*, 697 F.2d at 226–27; the nature of the prior proceeding, *see DiNapoli*, 8 F.3d at 912–13; any differences in the burdens of proof, *see id.* at 913; the information known to the examining party at the time of the prior testimony; the motive of the examining party to avoid disclosing such information, *see id.*; the scope of examination undertaken and forgone, *see id.* at 914–15;[9] and whether the prior testimony contradicts the evidence introduced at trial.

---

[8]*See also United States v. Huskey*, 90 F.4th 651, 670 (4th Cir. 2024) (holding that the district court did not abuse its discretion in excluding grand-jury testimony but noting that this is a fact-specific inquiry); *United States v. Omar*, 104 F.3d 519, 523–24 (1st Cir. 1997) (suggesting that the government will rarely have a similar motive to develop grand-jury testimony, looking for a motive to develop "the specific portion of the testimony at issue," and holding that grand-jury testimony was properly excluded under Rule 804(b)(1)).

[9]Cross-examination is relevant only insofar as it demonstrates motive; a failure to cross-examine does not necessarily show a dissimilarity of motive or foreclose the admission of prior testimony. *See DeLuryea*, 697 F.2d at 227 ("[The plaintiff's] counsel's decision to limit cross-examination in the workers' compensation hearing does not bar use of the former testimony even though [the plaintiff] might later have desired fuller cross-examination. Opportunity and motivation to cross-examine are the important factors, not the actual extent of cross-examination.").

In this case, the district court did not abuse its discretion in determining that the government's motive to cross-examine Dr. Ali before the grand jury was dissimilar to its motive at the time of trial. In a broad sense, the government may have had the same purpose in questioning Dr. Ali before the grand jury as it would have had at trial—to incriminate Euring. But an identity of overarching purpose is not conclusive on the question of motive. Although the government had *some* information about Dr. Ali's activities at the time of his testimony, the government proffered that S.G. had not yet told investigators about Dr. Ali when he testified. In fact, two years elapsed before S.G. told the government that Dr. Ali had forced her to use cocaine, tied her hands, and refused to let her leave. And Dr. Ali testified prior to some of S.G.'s clients. Thus, at the time of Dr. Ali's grand-jury testimony, the government did not yet have access to all the information that it later had at trial.

Additionally, Dr. Ali's testimony differed from evidence adduced at trial. Dr. Ali presented himself as someone who was trying to help S.G. and who had no knowledge that S.G. was using drugs. But S.G. testified that she had used cocaine with him, she had felt unsafe in his home, and he had threatened her. Although the government challenged Dr. Ali's grand-jury testimony on some points, it was not primarily concerned with impeaching him. The district court noted the inconsistency between Dr. Ali's testimony and the evidence, stating that there were no "indicia of reliability" in his testimony and that, at trial, the government likely would have been "gathering information and cross-examining him pretty hard." R. Doc. 148, at 9 (Sealed). The court did not abuse its discretion in finding that this inconsistency affected the government's motive at trial.

The government's incomplete information at the time of Dr. Ali's testimony limited the scope of the government's questioning, suggesting that the government's motives before the grand jury and at trial were not substantially similar. And the inconsistency between Dr. Ali's testimony and the evidence at trial, as well as the government's higher burden of proof at trial, suggests that the government would have been motivated to question him with greater intensity at trial. The district court

did not abuse its discretion in finding that the government's motive was dissimilar and refusing to admit the grand-jury transcript.[10]

## 2. *Extrinsic Evidence of Inconsistent Statements*

Euring next argues that the district court should have permitted him to introduce extrinsic evidence of S.G.'s prior inconsistent statements. He does so even though he denied S.G. the opportunity to explain the statements.

"Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). Euring argues that this rule requires only that the impeaching party give the witness the opportunity to deny the statement or the opportunity to explain it, but not both. Because Euring gave S.G. the opportunity to deny the statements, he argues that he should have been permitted to introduce extrinsic evidence.

We read Rule 613(b) differently. If the impeaching party were not required to give the witness the opportunity to explain the statement, then the word "explain" would be superfluous. The impeaching party would only be required to ask the witness if he or she had made the prior statement, because then the witness would have had the opportunity to deny the statement, and a denial needs no further explanation. We understand the rule, rather, to give the *witness* the option of explaining or denying the statement.

---

[10]Euring argues that the grand-jury transcript was crucial to his defense because it shows that S.G. met Dr. Ali through a dating site *before* the alleged trafficking. But Euring sought to introduce the entire transcript, with certain inadmissible portions redacted. He did not seek to introduce only the portion of Dr. Ali's testimony detailing how Dr. Ali met S.G. Because Euring has not raised the issue, we decline to consider whether the government had a similar motive to develop this specific portion of the testimony, nor do we consider whether a court may focus on the motive for developing a discrete topic when conducting its analysis under Rule 804(b)(1).

Our precedents are consistent with this reading. Extrinsic evidence may be admitted when a party "squarely confront[s]" a witness with a prior inconsistent statement and the witness denies the statement. *United States v. Durham*, 470 F.3d 727, 731–32 (8th Cir. 2006). A court does not abuse its discretion by declining to admit extrinsic evidence when the impeaching party never asked the witness about the prior statement. *United States v. Schnapp*, 322 F.3d 564, 571–72 (8th Cir. 2003). Furthermore, we have approved the use of extrinsic evidence when a witness was uncooperative, noting that "this rule only states that a witness be afforded the *opportunity* to explain; Rule 613(b) does not require a witness to actually explain or deny the prior inconsistent statements." *United States v. Kelly*, 436 F.3d 992, 996 (8th Cir. 2006).

Rule 613(b) gives the witness the option of denying the prior statement or explaining it. In doing so, the rule denies the impeaching party the prerogative to choose whether to allow an explanation if the party intends to offer extrinsic evidence of the statement. When a witness does not squarely deny a statement and asks for an opportunity to explain the statement, the impeaching party must give the witness an opportunity to explain or else risk rendering extrinsic evidence of the statement inadmissible.[11] Here, S.G. specifically asked to explain herself, and the

---

[11]It is only a risk of inadmissibility. Even when a party does not first confront a witness with an inconsistent statement, the court has discretion to allow extrinsic evidence if the witness is available to be recalled to explain or deny the statement, or even if the witness is unavailable if the interest of justice so requires. *Schnapp*, 322 F.3d at 571–72. Furthermore, the rule "does not require the *proponent* of the inconsistent statement to direct the witness's attention to the inconsistency and afford an opportunity for explanation. All that is required is that the witness *have* an opportunity to explain." *United States v. Peltier*, 800 F.2d 772, 777 n.8 (8th Cir. 1986) (emphases added). In *Peltier*, we noted that the district court should have permitted the defense to argue the inferences to be drawn from two inconsistent reports when the government gave the reports' author "an opportunity to explain the inconsistency" on redirect. *Id.* Here, on redirect, the government gave S.G. the opportunity to explain some of her inconsistent statements. But Euring does not

defense denied her the opportunity. The district court did not abuse its discretion in limiting the admission of extrinsic evidence to only those instances in which S.G. did not ask to explain herself.[12]

## B. *Sufficiency of the Evidence*

Euring also argues that the evidence was insufficient to support his conviction for sex trafficking of a child. He contends that the government failed to prove that he "knew or recklessly disregarded that S.G. would engage in a commercial sex act." Appellant's Br. at 27.

"We review the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Paul*, 885 F.3d 1099, 1101 (8th Cir. 2018) (internal quotation marks omitted). We will reverse only when "no reasonable jury could find all the crime's elements beyond a reasonable doubt." *Id.* at 1102 (cleaned up).

Euring was convicted of violating 18 U.S.C. § 1591(a), which provides:

(a) Whoever knowingly—

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

---

argue that these statements should be treated differently, so we decline to consider the question.

[12]We note that Euring actually *asked* Poirier—without objection—about one statement that S.G. had wanted to explain.

-13-

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

When, as here, a defendant is charged with trafficking a child, the statute requires the government to prove that the defendant knew, or recklessly disregarded, that the child would "engage in a commercial sex act." *Id.* We have held that the government need not prove that the victim actually engaged in a commercial sex act. *Paul*, 885 F.3d at 1103. Under the statute, the commercial sex act is in the future, relative to the criminal activity of recruiting, harboring, or transporting. *Id.* In *Paul*, we affirmed a conviction when the victim never engaged in a commercial sex act because the evidence showed that the defendant had the requisite knowledge at the time he harbored the victim. *Id.*

Thus, the government was not required to prove that S.G. engaged in a commercial sex act. Instead, the government was required to prove that Euring knew or recklessly disregarded that she would do so. The government met this burden by introducing evidence that Euring suggested that S.G. make money by going on dates in Chicago, told S.G. that she could make more money by performing sex acts, created an account on a dating website and helped S.G. set up a profile that at one point offered "happy ending" massages, went with S.G. to Chicago on two weekends so that she could meet with clients, rented a hotel room in Chicago, communicated with clients, took S.G. to and from appointments with clients, and took some of the proceeds from S.G.'s appointments. This proof satisfies evidentiary sufficiency.

-14-

And even if the government were required to prove that S.G. actually engaged in a commercial sex act, the evidence would be sufficient. S.G. testified that she engaged in sex in exchange for money. One client testified that he paid S.G. and that she masturbated him. Another, after first giving an equivocal answer, testified that he believed oral sex occurred and that he believed he paid S.G. for that activity. Oral sex and masturbation are sex acts within the meaning of § 1591(a). *See United States v. Jungers*, 702 F.3d 1066, 1075–76 (8th Cir. 2013) (oral sex); *United States v. Taylor*, 44 F.4th 779, 788 (8th Cir. 2022) (masturbation).

S.G.'s story has certainly changed over time. But relevant portions of her testimony were corroborated in part by phone records and the testimony of clients. Furthermore, the jury determines credibility. *See United States v. Scofield*, 433 F.3d 580, 585 (8th Cir. 2006) ("[The defendant] attacks the credibility and coherence of [the informant's] testimony but such disputes are issues for the jury to decide."). Thus, the evidence sufficiently supports Euring's conviction.

## III. *Conclusion*

The district court did not abuse its discretion in excluding the grand-jury transcript and in limiting Euring's use of extrinsic impeachment evidence. And sufficient evidence supports Euring's conviction. Therefore, we affirm.

_____