**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald Earl GEIGER, Defendant–**
**Appellant.**

**No. 99–30393.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 2001

Filed Aug. 31, 2001

John C. Pharr, Anchorage, Alaska, for the appellant.

Steven E. Skrocki, Assistant United States Attorney, Anchorage, Alaska, for the appellee.

Before: PREGERSON, THOMAS and GOULD, Circuit Judges.

THOMAS, Circuit Judge:

Ronald Earl Geiger murdered Hank Dawson in Palmer, Alaska, by attaching a bomb to Dawson's pickup truck and blowing it up. Geiger confessed to the crime, but claimed he had been coerced into doing it by John Wheeler, who was having an affair with Dawson's wife. Geiger was ultimately convicted of malicious destruction of a vehicle used in and affecting interstate commerce in violation of 18 U.S.C. § 844(i), using and carrying a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1), and possession of a destructive device in violation of 26 U.S.C. § 5861(c). He was sentenced to life imprisonment, plus a term of thirty years. He appeals his convictions.

I

Geiger contends that the district court lacked jurisdiction because Dawson's truck was not used in an "activity affecting interstate or foreign commerce," which is a jurisdictional prerequisite for a conviction under 18 U.S.C. § 844(i) that must be proved to the jury beyond a reasonable doubt. *See United States v. Pappadopoulos*, 64 F.3d 522, 524 (9th Cir.1995). Section 844(i) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce ... and if death results to any person, ... shall ... be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

Congress intended under § 844(i) to exercise its full power under the Commerce Clause to cover all activity substantially affecting interstate commerce, *Russell v. United States*, 471 U.S. 858, 859–62, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), which is the third category of constitutionally regulable activity later reconfirmed in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

█ In this case, the government offered uncontradicted evidence showing that Dawson's truck was subject to an out-of-state lease and insured by an *out-of-state* insurance company. It argues that this creates a sufficient nexus to interstate commerce to sustain the conviction. Geiger argues that the tendered evidence is insufficient to establish jurisdiction under § 844(i) as a matter of law. *Cf. United States v. Gomez*, 87 F.3d 1093, 1096 (9th Cir.1996) ("Therefore, to satisfy the jurisdictional requirement, the government needed to prove only that this building is in use in the rental market, which *per se* substantially affects interstate commerce."). Because Geiger's challenge is jurisdictional, he may raise it for the first

time on appeal, *see United States v. Arbo*, 691 F.2d 862, 865 (9th Cir.1982), and we review the question *de novo*, *United States v. Bennett*, 147 F.3d 912, 913 (9th Cir. 1998).

 In determining whether the damaged property was "used in" interstate commerce under § 844(i), the Supreme Court has held that the proper inquiry is first into the function of the property itself, and then "a determination of whether that function affects interstate commerce." *Jones v. United States*, 529 U.S. 848, 854, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (internal quotation marks and citation omitted). Specifically, the "['used in'] qualification is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* at 855, 120 S.Ct. 1904. Thus, a private, owner-occupied residence not used in business activity falls outside of § 844(i)'s range, despite the building's collateral, "passive" ties to interstate commerce—the receiving of out-of-state natural gas, an out-of-state mortgage, and an out-of-state casualty insurance policy. *Id.; see also Pappadopoulos*, 64 F.3d at 526–27 (receipt of out-of-state natural gas insufficient where private residence not used for any commercial activity). For this reason, the fact that the truck was insured by an out-of-state company is insufficient to trigger federal jurisdiction under § 844(i).

 In contrast, a privately occupied rental unit, used solely as a private residence, does meet Congress's intended jurisdictional reach. *Russell*, 471 U.S. at 862, 105 S.Ct. 2455. Because "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties," a rental unit is "used in" an activity that "unquestionably" affects interstate commerce. *Id.; see also Gomez*, 87 F.3d at 1095 (local rental is an element of a broader commercial market

and thus falls under § 844(i)'s purview). Although *Russell* predated *Jones*, the *Jones* court explained that *Russell* properly analyzed the function of the property at issue there, and that it correctly concluded that the rental market is an activity that substantially affects interstate commerce. *Jones*, 529 U.S. at 856, 120 S.Ct. 1904.

Here, under the reasoning of *Russell*, the function of Dawson's truck was to be used in the national truck leasing market. The Supreme Court has instructed that, when determining the function of the property at issue, the common sense, "ordinary meaning" of "use" must be employed. *See Jones*, 529 U.S. at 855–56, 120 S.Ct. 1904. The government here offered evidence showing that the victim's truck was leased from an out-of-state national leasing company. Like a rental unit, a leased truck is owned by someone other than the user, and it may be used again for a business purpose, such as leasing. To the extent that "common perception" dictates that a rental apartment is used in the activity of renting real estate, a leased truck surely is "unquestionably" used in the activity of leasing vehicles. *Cf. Jones*, 529 U.S. at 856, 120 S.Ct. 1904 ("It surely is not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy."). A "local [lease of a truck] is merely an element of a much broader commercial market in [trucks used for lease]." *Russell*, 471 U.S. at 862, 105 S.Ct. 2455. And, the leasing market, like the rental market, is a national one that substantially affects interstate commerce. *See, e.g., United States v. Viscome*, 144 F.3d 1365, 1369 (11th Cir.1998) ("Because interstate truck leasing is itself a tangible component of interstate commerce, the truck necessarily was used in an activity that in the aggregate has a substantial effect on interstate commerce."). Thus, the fact that Dawson's

truck was subject to a lease means that the truck was "used in" an activity affecting interstate commerce.

Jones does not compel a contrary finding. Unlike the privately owned and occupied home in *Jones*, the truck here was owned by a leasing company and used in the leasing market. Dawson had not yet exercised his option to buy the truck, an act that arguably would have taken the truck out of the leasing market and into the realm of private use, which, under *Jones*, is not covered by § 844(i). Dawson's option to buy the car did not ripen until his lease term expired; Dawson's truck remained the property of Ford Motor Company, and it therefore remained in the nationwide truck leasing market. Thus, under *Russell*, the district court had jurisdiction under § 844(i).

## II

■ The district court did not err in admitting the prior testimony of arresting officer Alaska State Trooper David Churchill at the federal suppression hearing. Prior to the issuance of the federal indictment, Geiger was indicted in the State of Alaska for murder in the first degree. The state court suppressed Geiger's taped confession because the arresting officers did not comply with Alaska's custodial interrogation requirements as dictated by *Stephan v. State*, 711 P.2d 1156 (Alaska 1985). Officer Churchill testified in the state suppression hearing, but died before the federal suppression hearing was conducted. The magistrate judge consequently admitted Churchill's prior testimony, over Geiger's objection, under Federal Rule of Evidence 804(b)(1).

■ Under Rule 804(b)(1), prior testimony of an unavailable declarant, given at a previous hearing of the same type of proceeding, is not excludable as hearsay if the adverse party (here Geiger) "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" in the previous proceeding. Fed.R.Evid. 804(b)(1). The "similar motive" requirement is inherently factual and depends, at least in part, on the operative facts and legal issues and on the context of the proceeding. *United States v. Salerno*, 505 U.S. 317, 324–25, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992); *United States v. Koon*, 34 F.3d 1416, 1428 (9th Cir.1994), *rev'd in part on other grounds*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *see also, e.g., United States v. Poland*, 659 F.2d 884, 896 (9th Cir.1981) (where witness's identification of defendant was central issue at suppression hearing and at trial, motive to attack credibility was same in both proceedings). " '[S]imilar motive' does not mean 'identical motive'. . . ." *Salerno*, 505 U.S. at 326, 112 S.Ct. 2503 (Blackmun, J., concurring).

Geiger argues that he did not have a "similar motive" because the state proceeding focused on the requirements of *Stephan v. State*, while the federal proceeding "concerned the time and sufficiency of the Miranda advisement, the voluntariness of Mr. Geiger's statement, and Mr. Geiger's request for counsel." However, the issues raised in Geiger's state and federal suppression motions, the actual legal and factual issues underlying the hearings, and the content of Churchill's testimony at the state hearing indicate that Geiger indeed had a very similar—if not the same—motive in both proceedings.

Both motions to suppress presented virtually the same issues: whether Geiger's taped confession was coerced and involuntary; whether Geiger had been properly *Mirandized*; whether the arrest was pretextual; and whether Geiger had been unlawfully detained. The state motion also argued that the tape recording requirements of *Stephan v. State* were not met. Geiger attached the same detailed affidavit

in both hearings. Because the issues were "substantially similar" in both hearings, *see Koon,* 34 F.3d at 1428, his motive in developing Churchill's testimony was similar in both hearings: to determine Churchill's motives and intentions during the interview and arrest, and to gain Churchill's testimony about exactly what happened.

Churchill's actual testimony demonstrates that Geiger had a "similar motive." Churchill's direct testimony addressed how he became involved in the interrogation; whether he was familiar with Alaska's tape recording requirements and why he did not record the first half of the interview; his intentions in interviewing Geiger; descriptive details of how the interview was conducted; whether Geiger asked for an attorney or did not want to talk; whether he coerced Geiger into talking; and whether he instructed Geiger what to say and threatened to continue to hold Geiger's family in custody. This testimony addresses the issues pertinent to both suppression hearings.

Geiger also makes much of the fact that Churchill's testimony during cross-examination primarily focused on the *Stephan* issue, and did not focus on the other coercive acts and denial of rights that Geiger alleged in his motion. However, Geiger clearly had the opportunity to develop testimony in that direction, as evidenced by the presentation of issues in Geiger's motions and by the fact that these issues were addressed during direct examination. Any failure to cross-examine Churchill resulted not from lack of opportunity but from the defense attorney's utilization of that opportunity. *See Koon,* 34 F.3d at 1426; *see also Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.") (emphasis

in original). Geiger's motive in developing the testimony existed before the first question was asked. The district court did not abuse its discretion in admitting Churchill's testimony.

### III

 Geiger also argues, for the first time on appeal, that the indictment was defective because count four did not state all the elements of the crime, and because count five did not state a specific crime at all. Because a defective indictment would deprive the district court of jurisdiction, this claim may be raised initially on appeal. *United States v. Ruelas,* 106 F.3d 1416, 1418 (9th Cir.1997). However, because Geiger did not challenge the indictment below, we construe the indictment liberally. *See id.* at 1419. "When the sufficiency of the indictment is challenged after trial, it is only required that the necessary facts appear in *any form* or *by fair construction* can be found within the terms of the indictment." *Id.* (citation omitted, emphasis in original).

Count four alleged a violation of 18 U.S.C. § 924(c)(1):

On or about October 18, 1993, in the District of Alaska, the defendant RONALD EARL GEIGER knowingly used and carried a firearm, to wit: a destructive device in the form of an explosive bomb, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, said crime of violence being a violation of Title 18 United States Code, Sections 1958 and 844(i). All of which is in violation of and contrary to Title 18 United States Code, Section 924(c)(1).

 Geiger argues that this count "fails to name the alleged crimes" and only makes general reference to 18 U.S.C. §§ 1958 and 844(i). In *Ruelas,* however, we held that, where "use or carry" was in

the heading but not the body of the § 924(c)(1) count, and where the count referred to the relevant statute, the indictment adequately informed defendant of the elements of the charged offense. 106 F.3d at 1419. The above count includes the "knowingly used and carried" language in the actual body of the count, and it refers to the relevant statute, 18 U.S.C. § 924(c)(1). This suffices to inform Geiger of the elements of the charged offense.

Count five alleged a violation of 26 U.S.C. § 5861(c), which criminalizes the receipt or possession of "a firearm made in violation of the provisions of this chapter":

On or about October 18, 1993, in the District of Alaska, the defendant RONALD EARL GEIGER knowingly possessed a firearm, to wit: a destructive device in the form of an explosive bomb, made in violation of 26 U.S.C. § 5822. All of which is in violation of and contrary to Title 26 United States Code, Sections 5822, 5845 [defining "firearm"], 5861(c) and 5871 [specifying penalty].

Section 5822 requires a putative bomb-maker to make a "written application [to] the Secretary," to pay a specified tax, and to gain the permission of "the Secretary to make and register the firearm." 18 U.S.C. §§ 5822, 5861(c); see United States v. Combs, 762 F.2d 1343, 1346 (9th Cir.1985).

Geiger contends that "these are general allegations, and do not state all of the elements of a crime. There is no indication of why possessing such a device is in violation of Title 26 United States Code, § 5822, 5845, 5861(c), and 5871." Although Geiger is correct that the count does not clarify the requirements of § 5822, the count informed Geiger that he was charged with possession of a "firearm" that was made in violation of federal law, and that the firearm was a bomb. The count also referenced the specific code section. Under the liberal standard appropriate at this stage, this sufficed to inform

Geiger of the elements of the charged offense. See Ruelas, 106 F.3d at 1419; United States v. James, 980 F.2d 1314, 1317–18 (9th Cir.1992).

IV

Finally, Geiger makes two attacks on his prosecution that are based on doctrines of federalism: He argues that the district court should have abstained under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746 (1971), and that, in enacting § 844(i) and § 924(c), Congress preempted state law in violation of (presumably—Geiger does not clarify this argument) the Tenth Amendment. Both claims lack merit.

First, Younger abstention does not apply to federal criminal prosecutions; a federal prosecutor can indict a state criminal defendant even while state proceedings are ongoing. See Abbate v. United States, 359 U.S. 187, 195, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (holding that state and federal authorities can prosecute an individual for the same offense).

Second, the Tenth Amendment does not bar Congress from enacting criminal statutes. Geiger misconstrues the nature of federal pre-emption: If Congress has the constitutional authority to enact legislation, then the pre-emption question is whether Congress intended to displace state law in that area, not whether the existence of state law forbade Congress from regulating. Lorillard Tobacco Co. v. Reilly, —— U.S. ——, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). The Supremacy Clause allows Congress to legislate within the confines of its constitutional, affirmative grant of authority under Article II, § 9. See U.S. Const., art. VI, cl. 2. If Congress can regulate the criminal behavior at issue under the Commerce Clause— which it can here—then a federal court can hear the prosecution. The state court's

concurrent jurisdiction to prosecute does not bar this.

## V

In sum, the district court had jurisdiction under 18 U.S.C. § 844(i) to hear this prosecution because Dawson's leased truck was "used in" an activity that substantially affects interstate commerce, and because the indictment was not defective. The district court did not abuse its discretion in admitting the prior testimony of Officer Churchill. Finally, this case does not implicate any issues of federalism that Geiger has raised.

**AFFIRMED.**