**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. DANIEL RICHARD GARCIA, *Defendant-Appellant*. | No. 12-10189 <br><br> D.C. No. 2:11-cr-00290-LKK-1 <br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted
February 11, 2014—San Francisco, California

Filed September 18, 2014

Before: Richard C. Tallman and Johnnie B. Rawlinson,
Circuit Judges, and Marvin J. Garbis, Senior District
Judge.[*]

Opinion by Judge Rawlinson

---

[*] The Honorable Marvin J. Garbis, Senior District Judge for the U.S.
District Court for the District of Maryland, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for using a pipe bomb to damage a vehicle and apartment building in violation of 18 U.S.C. § 844(i).

The panel rejected the defendant's contention that there was insufficient evidence that any damage to the apartment building substantially affected interstate commerce, and that the government therefore did not satisfy the Commerce Clause jurisdictional element of § 844(i).   The panel concluded that nothing in *United States v. Morrison*, 529 U.S. 598 (2000), undermined the *per se* rule in *Russell v. United States*, 471 U.S. 858 (1985), that damage to a rental apartment building satisfies the jurisdictional provisions of § 844(i).

### COUNSEL

Timothy E. Warriner, Sacramento, California, for Defendant-Appellant.

Michael D. Anderson (argued) and Phillip A. Talbert, Assistant United States Attorneys, Sacramento, California, for Plaintiff-Appellee.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

## OPINION

RAWLINSON, Circuit Judge:

Appellant Daniel Garcia (Garcia) challenges his conviction for using a pipe bomb to damage a vehicle and apartment building in violation of 18 U.S.C. § 844(i). Garcia contends that the government failed to present sufficient evidence to satisfy the Commerce Clause jurisdictional requirement of 18 U.S.C. § 844(i), because the government failed to demonstrate that Garcia's criminal conduct affected interstate commerce. Garcia also maintains that the district court erred in instructing the jury that damage to the rental apartment building and vehicle met the jurisdictional mandates, and that 18 U.S.C. § 844(i) is unconstitutional on its face. We affirm.

## I. BACKGROUND

### A. Indictment

In a four-count indictment, Garcia was charged with "maliciously damag[ing] and destroy[ing] and attempt[ing] to damage and destroy, by means of an explosive, a building and vehicle used in interstate commerce, and in an activity affecting interstate commerce" in violation of 18 U.S.C. § 844(i).[1] The indictment alleged that Garcia "knowingly

---

[1] 18 U.S.C. § 844(i) provides in relevant part: Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building . . . shall be imprisoned . . .

carr[ied] and use[d] a destructive device, to wit, a pipe bomb" in violation of 18 U.S.C. § 924(c)(1)(A).[2]

### B. Garcia's Motion To Dismiss The Indictment

Prior to trial, Garcia filed a motion to dismiss the indictment. Garcia asserted that the government was unable to satisfy the Commerce Clause jurisdictional requirements of § 844(i) because there were no allegations that the privately owned vehicle, a Chevrolet Tahoe SUV, was utilized in interstate or foreign commerce by the vehicle's owner. The district court denied Garcia's motion.

### C. Garcia's Proffered Interstate Commerce Jury Instruction

During the jury instruction conference, Garcia proffered an interstate commerce instruction providing that:

> Used in interstate commerce means that a vehicle or a building is used in an activity substantially affecting interstate or foreign commerce if the vehicle or building is actively used for commercial purposes and the vehicle or building does not merely have a passive, passing, or past connection to interstate or foreign commerce. A vehicle or building may affect interstate commerce if it takes on economic functions unrelated to every day, non-commercial, private use. The fact that the vehicle is manufactured in a different state or is insured by an out-of-state company is

---

[2] The other counts alleged in the indictment are not at issue on appeal.

insufficient to trigger federal jurisdiction under 844(i) or to fulfill the fourth element of the offense.

The district court rejected Garcia's proffered instruction, and instead instructed the jury that an apartment building "is used in interstate commerce, or in an activity affecting interstate commerce, if it contains rental units and is used as rental property," and that "[a] vehicle is used in interstate commerce if it is transported from the state where it was manufactured into another state."

### D.  Trial Testimony and Verdict

At trial, Jantina Reed (Reed) testified that she, her boyfriend, Kenneth Clark (Clark), and two children resided in Garcia's house for approximately two and a half months. Reed eventually moved from Garcia's home because of Garcia's unusual behavior. According to Reed, Garcia would "run around naked" and "stand in front of [her] doorway and breathe hard . . ." Reed and her family moved to an apartment complex in Fairfield, California, and did not inform Garcia of their new address. However, Garcia came to their apartment complex on two occasions in an attempt to contact Reed and her family. During one incident, Reed called the police, and Garcia was arrested.

Reed related that she had an altercation with Garcia when she had a vehicle towed from his residence. As the vehicle was being towed, Garcia threw several items on Reed's car and threatened, "tick, tick, boom, I'm going to blow this up to pieces." Garcia also allegedly told Reed, "you know I have the means to do it, and if I can't get it, I can go online

and get it. . . ."  Reed did not hear from Garcia after the incident.

On May 26, 2011, Reed fell asleep at approximately 11:30 or 11:45 p.m. Reed subsequently "heard a giant bang noise" and "there was fire all in their window."  Reed grabbed her children and ran outside, where she saw flames coming from her Chevy Tahoe SUV, which Reed had borrowed from her mother.

Clark testified that he heard "a little noise like tink, tink, and then boom" before the apartment's window was engulfed in flames.  Clark went outside and extinguished the flames around the vehicle with a fire extinguisher.

Officer Christopher Grimm of the City of Fairfield Police Department responded to a police dispatch "just after 1:00 a.m. on May 27, 2011" to an apartment complex.  When he arrived, Officer Grimm noticed a blue Chevy Tahoe with "what appeared to be a steel galvanized pipe below it and several blue propane canisters around it."  Officer Grimm "collected . . . pieces of cardboard around the vehicle, approximately 20 feet or so in a kind of circular circumference around the vehicle, along with several blue propane canisters, the galvanized pipe and cap, and several pieces of duct tape and other materials that were found in the area."

Officer Grimm also measured the time and distance between the site of the explosion and a 24 Hour Fitness gym. According to Officer Grimm, it took "[a]pproximately five minutes and two seconds" at 2:45 a.m. to drive the 2.2 miles from the gym to the site of the explosion.

Detective William Shaffer of the City of Fairfield Police Department investigated the components of the explosive device. Detective Shaffer testified that the device was attached to five Worthington brand propane cylinders – a commonly available type of propane canister. Detective Shaffer related that the device was "a 2-inch by 12-inch piece of galvanized steel pipe . . . with Mueller brand end caps on both ends." Detective Shaffer believed that the device utilized smokeless or black powder, but he was unable to recover any materials indicating how the device was detonated. Detective Shaffer observed that the end cap had a drill hole that may have served as "an ignition source into the interior of the pipe." Detective Shaffer did not recover any timing devices or fuses.

Detective Shaffer also found damage from the explosion to the nearby apartment building. According to Detective Shaffer, there were impact marks approximately two to three feet from the ground in the stucco wall near the children's bedroom. Detective Shaffer opined that the impact marks were created by metal fragments from the pipe bomb or from the propane cylinders.

Detective Shaffer observed that the pieces from a cardboard box contained a model number. Detective Shaffer determined that the cardboard box served as the container for the pipe bomb and that the model number was for a "3,000 watt power inverter."

Detective Shaffer also participated in the search of Garcia's residence. During the search, the officers found a receipt for an AIMS 3,000 watt power inverter; a pipe bomb wrapped in a sheet in the garage; and a set of gopher gassers with fuses similar to the one on the pipe bomb. According to

Detective Shaffer, the pipe bomb found in Garcia's garage was similar to the one used in the apartment complex explosion because both bombs were "constructed out of a length of galvanized steel pipe, both of them had cast metal end caps on each end, both of them had paper towel or some type of a paper wadding, and both of them had gunpowder as a filler or combustible material inside."

Matthew Rainsberg (Rainsberg), a forensic chemist for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), determined that the two pipe bombs contained similar smokeless gunpowder, and that the fuse on the pipe bomb found in Garcia's garage was visually and physically similar to the fuses on the gopher gassers. Although Rainsberg could not conclusively determine if the fuses were the same, he opined that the fuses were "visually and physically similar, and . . . contain[ed] the similar fuse core powder."

Tania Kapila, an ATF fingerprint specialist, testified that Garcia's latent fingerprints and palm print were found on the gopher gasser control devices.

Robert Krause (Krause), a friend of Garcia's, testified that he drove Garcia to an apartment complex where Garcia identified a Chevy Tahoe as belonging to a friend. According to Krause, Garcia complained that he had problems with roommates who had taken "quite a few of his possessions." Garcia indicated that the roommates were "a mother and father and child . . ." Krause related that, a few weeks after driving Garcia to the apartment complex, Garcia showed Krause a pipe bomb that Garcia stored in an ice chest in his garage. Garcia did not inform Krause what he intended to do with the pipe bomb.

Leonard Duprez, a General Motors district manager for after sales, testified that, based on the vehicle identification number, the SUV damaged in the explosion was manufactured in Jamesville, Wisconsin.

Maricela Avila, a property manager, testified that the apartment complex in which the explosion occurred advertised apartment rentals online and that some of the residents who signed lease agreements came from out of state.

Sean Nichols (Nichols), the vice-president of sales for Aims Power, testified that the cardboard box from the site of the explosion resembled the outside box that Aims Power utilized for shipping power inverters. According to Nichols, Garcia purchased the only 3,000 watt power inverter that Aims Power shipped to Fairfield, California. Nichols confirmed that the product number on the cardboard box from the explosion corresponded to the part number associated with Garcia's order.

Dan Gagnon (Gagnon), the regional loss prevention manager for 24 Hour Fitness, reviewed Garcia's membership records for May 26–27, 2011. According to Gagnon, Garcia checked into the 24 Hour Fitness on May 26, 2011, at 11:01:06 p.m. and checked in again at 12:51:12 a.m. on May 27, 2011. Gagnon testified that the fitness center did not utilize a system reflecting when its members leave the facility.

Shalimar Ramirez (Ramirez), the service manager for 24 Hour Fitness, provided Garcia's check-in records pursuant to a subpoena. In June, 2011, Ramirez also met with an investigator from the Solano County Public Defender's

Office and reviewed video surveillance of Garcia's 11:00 p.m. check-in.  The video did not reflect that Garcia left the fitness center between 11:00 p.m. and 12:00 a.m.

Frank Huntington (Huntington), a private investigator appointed to assist Garcia, testified that he measured the duration of two routes from the 24 Hour Fitness to the apartment complex where the explosion occurred. Huntington estimated that one route took him "[a]pproximately nine minutes and two seconds" at 11:45 a.m. during "[n]ormal daytime traffic . . ."  The second route took Huntington "approximately eight minutes and fifty . . . seconds" at 1:50 p.m. during "normal daytime traffic."

Huntington also tested the length of time needed for a four-inch gopher gasser fuse to burn.  Huntington estimated that the fuses he tested took from 12.6 seconds to 13.4 seconds to burn.

Garcia testified that, on May 27, 2011, he drove his roommate's car to the 24 Hour Fitness and checked in at 12:51 a.m.  According to Garcia, he left the 24 Hour Fitness at approximately 2:00 a.m. and "went directly home, had a post-workout meal, got prepared to go to sleep, [and] made sure [his] dog was fed . . ." Garcia estimated that it took him approximately five to ten minutes to drive from the fitness center to his home.

Garcia stated that, on May 26, 2011, he checked into the fitness center at approximately 11:00 p.m.  According to Garcia, he lacked the energy to exercise and he left the fitness center "approximately 15 minutes later."  He went home; consumed "a power meal"; went to a restaurant for more food; returned home to "[l]et the meal digest"; watched

television; took his dog for a walk; and then returned to the fitness center. Garcia related that he left his home at 12:30 a.m. and arrived at the fitness center after purchasing energy drinks at a nearby store.

Garcia denied driving to the apartment complex that evening or possessing a pipe bomb. According to Garcia, he did not know who constructed the pipe bomb found in his garage and he used the gopher gassers for a rodent problem. Garcia acknowledged that he purchased the Aims power inverter and that he had an extensive background as an electrician.

Garcia filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied. The jury found Garcia guilty of malicious use of explosive materials in violation of 18 U.S.C. § 844(i). On the verdict form, the jury indicated its finding that the apartment building and the vehicle "were used in interstate commerce or in an activity affecting interstate commerce[.]"

The district court sentenced Garcia to 420 months' imprisonment and 60 months of supervised release. Garcia filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

"We review de novo [Garcia's] challenge to the sufficiency of the evidence, including questions of statutory interpretation." *United States v. Wright*, 625 F.3d 583, 590 (9th Cir. 2010) (citations omitted).

"This court reviews the constitutionality of a statute *de novo*." *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013) (citation omitted).

"We review the language and formulation of a jury instruction for an abuse of discretion.  However, when jury instructions are challenged as misstatements of law, we review them *de novo*."  *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014), *as amended* (citations, alteration, and internal quotation marks omitted).

## III.    DISCUSSION

Relying on *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), Garcia asserts that damage to the apartment complex did not satisfy the Commerce Clause jurisdictional element of 18 U.S.C. § 844(i) because there was insufficient evidence that any damage to the apartment building substantially affected interstate commerce.  We disagree, and conclude that the Commerce Clause jurisdictional element for a conviction pursuant to 18 U.S.C. § 844(i) was satisfied as discussed in *Russell v. United States*, 471 U.S. 858 (1985), and *United States v. Gomez*, 87 F.3d 1093 (9th Cir. 1996).

In *Russell*, the United States Supreme Court considered "whether 18 U.S.C. § 844(i) applies to a two-unit apartment building that is used as rental property."  *Russell*, 471 U.S. at 858.  The Supreme Court observed that "reference [in 18 U.S.C. § 844(i)] to any building used in any activity affecting interstate or foreign commerce expresses an intent by Congress to exercise its full power under the Commerce Clause."  *Id.* at 859 (alterations, footnote reference, and internal quotation marks omitted).  The Supreme Court held:

> By its terms . . . the statute only applies to property that is used in an activity that affects commerce.  The rental of real estate is unquestionably such an activity.  We need not rely on the connection between the market for residential units and the interstate movement of people, to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties.  The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.

*Id.* at 862 (footnote references and internal quotation marks omitted).

In *Gomez*, we consulted *Russell* to resolve the defendant's challenge to his conviction for arson.  According to Gomez, the prosecution failed to establish that the burned building substantially affected interstate commerce, as required for a conviction under 18 U.S.C. § 844(i).  *See Gomez*, 87 F.3d at 1094.  Although there was no testimony at trial as to any specific interstate commerce connection, the burned building was a six-unit apartment complex.  *See id.*  Gomez maintained that the Supreme Court's decision in *Lopez* "reinterpreted the Court's commerce clause jurisprudence, and thereby undermined *Russell*'s per se rule that all rental property affects commerce sufficiently enough to warrant federal jurisdiction under section 844(i). . . ."  *Id.*

In rejecting Gomez's argument premised on *Lopez*, we observed that in drafting § 844(i), Congress sought to reach

"those arsons that damage or destroy property that had been used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Id.* at 1095 (citation and internal quotation marks omitted). We interpreted the plain language of the statute as treating the interstate commerce aspect of the crime separately from the crime of arson, with the interstate aspect of the crime being totally dependent "on what the property had been used for (or whether the property was moving in interstate commerce). . . ." *Id.* at 1096. From that premise, we formulated the "proper inquiry" as whether application of § 844(i) to the burning of the six-unit apartment complex "regulates conduct that is commercial or economic in nature." *Id.* Citing *Russell*, we held that "an apartment building currently in use in the rental market is used in an activity affecting interstate commerce. . . ." *Id.* (citations omitted). We explained that "[a]lthough one apartment building may have no more than a de minimis effect on interstate commerce, the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id.* (citation omitted). When aggregated, the commercial market in rental properties "undeniably has a substantial effect on interstate commerce." *Id.* Therefore, applying § 844(i) to the aggregated commercial market in rental properties "regulates conduct that is within Congress's commerce power." *Id.* We concluded that the jurisdictional requirement of § 844(i) could be met by a showing that the damaged building was being used as a rental property. Such use "*per se* substantially affects interstate commerce. . . ." *Id.* In sum, we answered the "proper inquiry" by ruling that application of § 844(i) to the arson of the six-unit apartment complex regulated conduct that was commercial or economic in nature, and thereby within the reach of Congress's Commerce Clause powers. *Id.*

Garcia contends that *Gomez* and *Russell* are no longer binding precedent because those decisions were undermined by the Supreme Court in *Morrison*.  In *Morrison*, the Supreme Court held that Congress exceeded its constitutional authority in passing the Violence Against Women Act because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity. . ."  529 U.S. at 613.  However, we have consistently distinguished *Morrison*'s holding as limited to non-economic activity.  *See Voggenthaler v. Maryland Square LLC*, 724 F.3d 1050, 1060 (9th Cir. 2013), *as amended* ("The Supreme Court's decisions in *Lopez* and *Morrison* concerning non-economic activity are not relevant here, for the Court's holding in both depended upon the conclusion that the activities sought to be regulated were not commercial activities.") (citations omitted); *United States v. McCalla*, 545 F.3d 750, 754 (9th Cir. 2008) (distinguishing *Morrison* and *Lopez* because "the statutes in question had no connection to commerce or economic enterprise") (citation omitted); *United States v. Latu*, 479 F.3d 1153, 1156 (9th Cir. 2007) (holding that "[u]nlike the statutes at issue in *Lopez* and *Morrison*, [18 U.S.C.] § 922(g) contains a jurisdictional element, specifically requiring that [the defendant's] possession be in or affecting commerce. The presence of the jurisdictional element satisfies the Commerce Clause concerns articulated in *Lopez*. . . .") (citation and internal quotation marks omitted); *United States v. Clark*, 435 F.3d 1100, 1115 (9th Cir. 2006) (holding that "[t]he essential economic character of the commercial sex acts regulated by [18 U.S.C.] § 2423(c) stands in contrast to the non-economic activities regulated by the statutes at issue in *Lopez* and *Morrison*") (citations omitted).

In contrast to the statute invalidated in *Morrison*, § 844(i) possesses the requisite jurisdictional element missing in *Morrison*, as it specifically requires that the defendant damage or destroy "any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce . . ." 18 U.S.C. § 844(i). As the Supreme Court explained in *Russell*, "[t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." 471 U.S. at 862 (footnote reference omitted). Considering our precedent distinguishing *Morrison* and considering *Russell*'s holding that § 844(i) was validly enacted pursuant to Congress's Commerce Clause power, we reject Garcia's facial and as-applied challenges to the statute. *See Russell*, 471 U.S. at 859 ("The reference to any building used in any activity affecting interstate or foreign commerce expresses an intent by Congress to exercise its full power under the Commerce Clause.") (alterations, footnote reference, and internal quotation marks omitted); *see also Gomez*, 87 F.3d at 1096 ("According to the plain language of the statute, the interstate commerce aspect of the crime is distinct from the arson-it depends solely on what the property had been used for (or whether the property was moving in interstate commerce). . . .").[3]

---

[3] *Russell*'s holding that 18 U.S.C. § 844(i) was constitutional under the facts of that case completely undermines Garcia's facial challenge. *See United States v. Peeples*, 630 F.3d 1136, 1138 (9th Cir. 2010) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.") (citation omitted).

Garcia's assertion that *Morrison* undermined *Russell*'s analysis premised on the aggregate effect of a defendant's criminal conduct on interstate commerce is unavailing. The Second Circuit's opinion in *United States v. Logan*, 419 F.3d 172 (2d Cir. 2005) is instructive on this point. In *Logan*, the Second Circuit reviewed an arson conviction stemming from the burning of a rented fraternity house on a university campus. The defendant was convicted of violating 18 U.S.C. § 844(n), "which criminalizes conspiracy to commit arson on property that is used in interstate commerce or in any activity affecting interstate commerce. . . ." *Id.* at 179. The Second Circuit initially observed that the Supreme Court cited *Russell* with approval in *Jones v. United States*, 529 U.S. 848 (2000), a case decided post-*Morrison*. *See Logan*, 419 F.3d at 180.[4] The Second Circuit pointed out that the Supreme Court distinguished the owner-occupied residence at issue in *Jones* from the rental property at issue in *Russell*. *See Logan*, 419 F.3d at 180. The Second Circuit also noted that the Supreme Court recently reaffirmed in *Gonzales v. Raich*, 545 U.S. 1 (2005), Congress's power to regulate purely local activity if that local activity is part of an economic chain of activities substantially affecting interstate commerce. *See id.* The Second Circuit emphasized that this was the same rationale used in *Russell* to uphold "federal regulation of local

---

[4] In *Jones*, the Supreme Court considered "whether arson of an owner-occupied private residence falls within § 844(i)'s compass" and held that "an owner-occupied residence not used for any commercial purpose does not qualify as property used in commerce or commerce-affecting activity; arson of such a dwelling, therefore, is not subject to federal prosecution under § 844(i). . . ." 529 U.S. at 850–51 (internal quotation marks omitted). In support of its holding, the Supreme Court observed that *Russell* involved rented real estate, whereas in *Jones* "the owner used the property as his home, the center of his family life. He did not use the residence in any trade or business." *Id.* at 856.

properties involved in the nationwide class of activities that constitute the rental market for real estate." *Id.* (citation and internal quotation marks omitted). Moreover, the Second Circuit concluded that "even if we had reason to believe that *Russell*'s holding is questionable in light of *Morrison* and *Lopez*, it has not been expressly overruled by the Supreme Court. Courts of Appeals are therefore obligated to follow *Russell* until the Supreme Court itself sees fit to reconsider that decision. . . ." *Id.*

Although the Second Circuit addressed the conspiracy subsection of the statute in *Logan*, its reasoning is nevertheless instructive because the conspiracy subsection incorporates the other offenses defined in § 844. *See* 18 U.S.C. § 844(n) (punishing "a person who conspires to commit any offense defined in this chapter"). Based on our precedent distinguishing *Morrison* and *Lopez*, we also agree with the Second Circuit that those cases did not undermine *Russell*'s holding that damage to a rental apartment building satisfies the jurisdictional requirements of 18 U.S.C. § 844(i). Finally, we have expressed a similar reluctance to abandon Supreme Court precedent on the premise that a subsequent case has effected an implicit overruling of earlier Supreme Court precedent. *See Lacano Inv., LLC v. Balash*, No. 13-35854, – F.3d –, 2014 WL 4236461, at *5 (9th Cir. Aug. 28, 2014) (expressing that "we must follow [a Supreme Court opinion] which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions") (citation and alteration omitted).

Applying *Russell* and *Gomez*, we conclude that there was sufficient evidence to satisfy "*Russell*'s per se rule that all rental property affects commerce sufficiently enough to

warrant federal jurisdiction under section 844(i). . . ."[5] *Gomez*, 87 F.3d at 1094. The government presented evidence that the apartments were leased; the apartment building was advertised on the internet; and many of its residents were from out-of-state. The government also presented evidence that the apartment building was damaged by Garcia's use of an explosive device. Thus, the government satisfied the jurisdictional provisions of 18 U.S.C. § 844(i), and the district court properly denied Garcia's motion for a judgment of acquittal.

## IV.    CONCLUSION

We conclude that nothing in *Morrison* undermined *Russell*'s *per se* rule that damage to a rental apartment building satisfies the jurisdictional provisions of 18 U.S.C. § 844(i). *Morrison* did not overrule *Russell* or *Gomez* in any

---

[5] Although there is a serious question as to whether the government presented sufficient evidence that the Chevrolet Tahoe SUV was used in interstate commerce, *see United States v. Geiger*, 263 F.3d 1034, 1037 (9th Cir. 2001) (holding that "the 'used in' qualification is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce") (citation, alteration, and internal quotation marks omitted), we need not reach this issue. According to the verdict form, the jury determined that both the apartment building and the vehicle were "used in interstate commerce or in an activity affecting interstate commerce[.]" We affirm Garcia's conviction based on *Russell*'s *per se* rule that damage to a rented apartment building satisfies 18 U.S.C. § 844(i)'s jurisdictional requirement irrespective of the jury's finding concerning the vehicle. We also do not address Garcia's challenge to the district court's jury instruction concerning the vehicle because the district court properly instructed the jury that an apartment building "is used in interstate commerce, or in an activity affecting interstate commerce, if it contains rental units and is used as rental property."

way, and we are required to apply this binding precedent in affirming Garcia's convictions. The government presented sufficient evidence that Garcia's use of an explosive device damaged an apartment building that was used in interstate commerce.

**AFFIRMED.**