**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DENNIS MAHON,
*Defendant-Appellant*.

No. 12-10273

D.C. No.
2:09-cr-00712-DGC-1

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
May 11, 2015—San Francisco, California

Filed July 20, 2015
Amended October 20, 2015

Before: Sidney R. Thomas, Chief Judge, and Fortunato P.
Benavides,[*] and John B. Owens, Circuit Judges.

Order;
Opinion by Judge Owens

---

[*] The Honorable Fortunato P. Benavides, Senior Circuit Judge for the
U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel filed (1) an order amending its opinion, denying petitions for panel rehearing and rehearing en banc, and denying a motion to stay; and (2) an amended opinion affirming convictions under 18 U.S.C. § 844(i) and (n) for a pipe bomb explosion at the City of Scottsdale Office of Diversity and Dialogue.

In its amended opinion, the panel explained that an intrinsically non-economic building can qualify under § 844(i)'s interstate commerce requirement if the building actively engages in interstate commerce or activity that affects interstate commerce, and the fact that an entity is not-for-profit or municipal in nature does not foreclose a finding that it is actively engaged in interstate commerce. The panel held that the record demonstrates that the Diversity Office regularly engaged in activities that affected interstate commerce.

Because § 844(i) has the necessary jurisdictional interstate-commerce element, the panel rejected the defendant's facial challenge to its constitutionality. Because the Diversity Office possessed the requisite nexus to interstate commerce, the panel also rejected the defendant's as-applied challenge to the statute's constitutionality.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Daniel L. Kaplan (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender, Phoenix, Arizona, for Defendant-Appellant.

Joan G. Ruffennach (argued), Assistant United States Attorney; John S. Leonardo, United States Attorney; Mark S. Kokanovich, Deputy Appellate Chief, Phoenix, Arizona, for Plaintiff-Appellee.

**ORDER**

The opinion filed on July 20, 2015 is amended and filed concurrently with this order.

The panel voted to deny the petition for panel rehearing. Chief Judge Thomas and Judge Owens voted to deny the petition for rehearing en banc, and Judge Benavides so recommends.

The full court has been advised of the suggestion for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The panel voted to deny the motion to stay.

The motion to stay, the petition for rehearing, and the petition for rehearing en banc are **DENIED**. No further petitions shall be entertained.

## OPINION

OWENS, Circuit Judge:

Dennis Mahon appeals his convictions under 18 U.S.C. §§ 844(i) and (n) for the pipe bomb explosion at the City of Scottsdale Office of Diversity and Dialogue ("Diversity Office"), which injured three people and damaged property. Section 844(i) makes it a crime to damage or destroy, by means of an explosive, property that is "used in" interstate commerce or in "activity affecting" interstate commerce. Mahon contends his convictions are invalid because the Diversity Office's activities did not satisfy the statute's interstate commerce requirement. We have jurisdiction under 28 U.S.C. § 1291, and we affirm. The Diversity Office was property "used in" commerce or in "activity affecting" commerce.

A concurrently filed memorandum disposition addresses Mahon's other claims.

## I. FACTS

A. *The Diversity Office*

Scottsdale created the Diversity Office to, among other things, promote the city as a "tourist destination." One of the first of its kind in the country, it engaged in community outreach with businesses and cultivated relationships with local and national organizations.

Housed in the city's Human Resources building, the Diversity Office worked with chambers of commerce and partnered with corporations to sponsor and host cultural

events in Scottsdale.  Venues included public parks with free admission and resort hotels with tickets costing $60 each. These functions featured crowds ranging from the hundreds to the thousands, and national speakers who received appearance fees of up to $15,000.  Corporations collectively donated tens of thousands of dollars annually for some of these events, and food and entertainment vendors applied and paid fees to the Diversity Office to participate.

The Diversity Office promoted these functions through direct mailings, media outlets, and dedicated phone lines.  It also worked with out-of-state organizations (including the American Speakers Bureau) to identify speakers, prepare contracts, arrange transportation, and ensure payment. Several speakers were paid to travel from out of state to address audiences in Scottsdale.

B.  *The Bombing*

On February 21, 2004, a Scottsdale employee found a box, addressed to the director of the Diversity Office, in a library carrel.  After sitting behind the library circulation counter for a few days, the box made its way to the Diversity Office.  On February 26, 2004, the director opened the box, which triggered a massive pipe bomb explosion.  He suffered severe trauma, requiring multiple surgeries and skin grafts, and nearly lost a finger.  Two other employees endured injuries, including shrapnel in an eye.  The powerful blast shattered windows, blew a hole in the counter upon which the box rested, and caused a wall and the ceiling to collapse.

A few months earlier, Mahon left a voicemail message with the Diversity Office.  He identified himself as "Dennis Mahon of the White Aryan Resistance of Arizona," used

racial epithets, and complained about the Diversity Office's outreach efforts. He concluded his call by stating: "The White Aryan Resistance is growing in Scottsdale. There's a few white people who are standing up. Take care." Based in part on that voicemail, law enforcement initiated a multi-year undercover investigation, which provided overwhelming audio, video, forensic, and circumstantial evidence that Mahon participated in the bombing of the Diversity Office.

After a multi-week trial, Mahon was convicted of conspiracy to damage buildings and other real property by means of explosive in violation of 18 U.S.C. §§ 844(i), (n) (Count 1)[1] and malicious damage of a building by means of explosive in violation of § 844(i) (Count 2). He received a sentence of 40 years imprisonment.[2]

## II. ANALYSIS

A. *Standard of Review*

We review de novo if there is sufficient evidence of the interstate commerce element of an offense. *United States v. Garcia*, 768 F.3d 822, 827 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1189 (2015). We consider the evidence in the light most favorable to the prosecution and determine whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United*

---

[1] Section 844(n) makes conspiring to violate § 844(i) a crime. We refer to § 844(i) when addressing Counts 1 and 2.

[2] Mahon also was convicted of 18 U.S.C. § 842(p)(2)(A), distribution of information related to explosives (Count 3), and received a concurrent sentence of 33 months on that count.

*States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We review de novo a constitutional challenge to a statute. *Garcia*, 768 F.3d at 827.

B.  *The Diversity Office's Nexus to Interstate Commerce*

Mahon first argues that there was insufficient evidence that the Diversity Office satisfied § 844(i)'s interstate commerce requirement.  A defendant is guilty of violating § 844(i) if he

> maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce[.][3]

According to Mahon, the Diversity Office "was a municipal government entity engaged in classic governmental functions," and thus could not possess the requisite interstate commerce nexus under § 844(i).  In so arguing, Mahon relies, in part, on two cases: *Jones v. United States*, 529 U.S. 848 (2000), and *United States v. Lamont*, 330 F.3d 1249 (9th Cir.

---

[3] 18 U.S.C. § 841(b) defines "interstate commerce or foreign commerce," in relevant part, as "commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, and commerce between places within the same State but through any place outside of that State."

2003).   A review of those cases—as well as other cases applying § 844(i)—confirms that the Diversity Office satisfies the statute's interstate commerce requirement.

*Jones* addressed if and when § 844(i) applied to a private residence that did not actively engage in interstate commerce—"a dwelling place used for everyday family living," and not a rental, "a home office or the locus of any commercial undertaking." *Jones*, 529 U.S. at 856, 859.  The Court set out a two-step inquiry to answer this question—first "into the function of the building itself, and then a determination of whether that function affects interstate commerce." *Id.* at 854 (internal quotation marks omitted). The Court stressed that the statute requires "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* at 855.

*Jones* held that § 844(i) did not apply to the traditional private home.  The residence in *Jones* had only passive links to interstate commerce: a mortgage, an insurance policy, and the receipt of natural gas from sources outside Indiana. *Id.* at 855–56.  Applying § 844(i) to a purely private home would mean that "hardly a building in the land would fall outside the federal statute's domain," as "[p]ractically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce." *Id.* at 857.

*Lamont* addressed § 844(i)'s application to an "ordinary church building" that was "used for religious purposes, and not for other activities of a commercial or economic

character." 330 F.3d at 1254. Recognizing the "peculiarity of hunting for commerce in a house of worship," the panel reasoned that the church's business was not commercial, but "to provide spiritual guidance, comfort, and charity to its members and to others who may wish to take advantage of its services." *Id.* at 1253, 1255. A church generally did "not function in a manner that places it in any significant relationship with commerce, let alone interstate commerce. . . . Indeed, a church's function and operations could not be further removed from what we ordinarily understand as commercial activity." *Id.* at 1254–55.

Nor was there anything about the church's activities in *Lamont* that would bring it within § 844(i)'s jurisdictional scope. Like the private residence in *Jones*, the church lacked active involvement in interstate commerce—all of its connections were passive: (1) it received gas from Canada, (2) an out-of-state company insured it, (3) it purchased goods from out of state, (4) it received funds from out-of-state members, and (5) it received and distributed publications that traveled interstate. *Id.* at 1250, 1253. These attenuated connections to interstate commerce, like those in *Jones*, were insufficient to satisfy § 844(i)'s requirement. *Id*. at 1255–56.

*Jones* and *Lamont* (as well as numerous other cases) teach us that a building may qualify *per se* under § 844(i)'s jurisdictional requirement if it is inherently commercial. A church and a private residence, without more, are not such buildings, but an apartment building used as rental property, *Russell v. United States*, 471 U.S. 858, 862 (1985); *Garcia*, 768 F.3d at 829, and a restaurant, *United States v. Serang*, 156 F.3d 910, 913 (9th Cir. 1998), are.

*Jones* and *Lamont* also teach us that an intrinsically non-economic building can qualify under § 844(i) if the building actively engages in interstate commerce or activity that affects interstate commerce, as there is no categorical exclusion of any type of building. *See Jones*, 529 U.S. at 855 ("[Section] 844(i) excludes no particular type of building. . . ."). As we have recognized, a place of worship can have more than one function for § 844(i) purposes. *United States v. Renteria*, 557 F.3d 1003, 1008–10 (9th Cir. 2009) (holding that a synagogue's operation of preschool daycare center and gift shop were sufficient for § 844(i) conviction, even though activities were located in a house of worship); *see also United States v. Grassie*, 237 F.3d 1199, 1209-10 (10th Cir. 2001) (church activities can be both religious and commercial); *United States v. Terry*, 257 F.3d 366, 369 (4th Cir. 2001) ("An activity can have both a religious aspect and an economic one. We cannot close our eyes to the commercial nature of an activity solely because non-commercial considerations also underlie it."); *United States v. Rayborn*, 312 F.3d 229, 233 (6th Cir. 2002) ("For purposes of the function analysis, the building's function is not limited to its primary use.").

That an entity is not-for-profit or municipal in nature also does not foreclose a finding that it is actively engaged in interstate commerce. There is "[n]othing intrinsic to the nature of nonprofit entities [that] prevents them from engaging in interstate commerce." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 585 (1997). Like non-profit and for-profit entities, municipalities can "purchase goods and services in competitive markets, offer their facilities to a variety of patrons, and derive revenues from a variety of sources, some of which are local and some out of State." *See id.* at 585–86.

Although the reach of § 844(i) "is not coterminous with the outer limits of Congress's Commerce Clause power," *see Lamont*, 330 F.3d at 1251, many cases outside of the § 844(i) context demonstrate the impact of tourism, events, and visitors on interstate commerce. *See Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011) ("bringing out-of-state tourists to hotels to play golf . . . falls squarely within the Supreme Court's Commerce Clause jurisprudence"); *United States v. Taylor*, 966 F.2d 830, 835-36 (4th Cir. 1992) (finding that a change in betting laws would have an effect on interstate commerce, in part, because it would stimulate the state economy by attracting out-of-state tourists); *Gibbs v. Babbitt*, 214 F.3d 483, 493–94 (4th Cir. 2000) (acknowledging as interstate commerce nexus the tourism associated with red wolf recreational industry, including visitors attending "howling events" and volunteers coming "from all around the country"); *907 Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1351 (11th Cir. 2012) (holding that there is a substantial effect on interstate commerce where a "[m]useum invites and receives thousands of admission-paying visitors from beyond Florida"; "it is well-settled that, when local businesses solicit out-of-state tourists, they engage in activity affecting interstate commerce").

Here, we need not decide whether the Diversity Office is "inherently" a commercial enterprise (like a rental property or a restaurant). Rather, we need determine only if the Diversity Office actively engages in interstate commerce, or activity that affects interstate commerce. *See, e.g.*, *Renteria*, 557 F.3d at 1008–10; *see also Rayborn*, 312 F.3d at 234–35 ("church was actively employed in commercial activities" by using radio broadcasts to increase travel from neighboring

states, hosting free events and concerts that people traveled to from those states, and purchasing goods to host picnics and breakfasts); *Terry*, 257 F.3d at 370–71 (operation of church day care center sufficient for § 844(i) conviction, even though activity was intrastate and did not turn a profit); *United States v. Gillespie*, 452 F.3d 1183, 1188 (10th Cir. 2006) (operation of gift shop and for-fee preschool within place of worship constituted "'active employment for commercial purposes'").

The record demonstrates that the Diversity Office regularly engaged in activities that affected interstate commerce. Partnering with numerous corporate sponsors and local hotels, it planned, hosted, and supported events that drew thousands of people to Scottsdale. It worked with a national bureau to arrange for speakers (who were paid thousands of dollars) to come to the city, and took applications and payments from vendors to participate in these events. And it employed several forms of media and a dedicated phone line to publicize its events.

Unlike the passive participation described in *Jones* and *Lamont*, the Diversity Office generated considerable activity that affected interstate commerce—indeed, more so than the activity described in numerous cases upholding a § 844(i) conviction. *Compare United States v. Craft*, 484 F.3d 922, 927–28 (7th Cir. 2007) (temporarily vacant rental properties were within § 844(i)'s scope); *United States v. Laton*, 352 F.3d 286, 300–01 (6th Cir. 2003) (fire station's role in fighting fires constituted active employment in interstate commerce); *United States v. Jimenez*, 256 F.3d 330, 339 (5th Cir. 2001) (as primary location of construction business, family's home office was within § 844(i)'s ambit).

We have little concern that our holding will convert the destruction of any "municipal building" in the Ninth Circuit into a federal crime. Any future § 844(i) prosecutions will be reviewed under the same case-by-case analysis that the Supreme Court and our precedent demand.[4]

## C. *Facial and As-Applied Challenges to § 844(i)'s Constitutionality*

Mahon next cites *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), to argue that § 844(i) is facially unconstitutional or unconstitutional as applied to this case. We have rejected facial challenges to § 844(i) before, distinguishing it from the *Morrison* and *Lopez* statutes, which lacked any jurisdictional nexus to interstate commerce. *See Garcia*, 768 F.3d at 829-30. In *Morrison* and *Lopez*, the Court invalidated the Violence Against Women Act and the Gun-Free School Zones Act, respectively, because each exceeded Congress's authority; the statutes did not regulate economic activity and they did not require that the activity be connected to interstate commerce. *Lopez*, 514 U.S. at 551; *Morrison*, 529 U.S. at 613, 619.

Unlike the statutes in *Morrison* and *Lopez*, § 844(i) has the necessary jurisdictional element. It requires that the defendant damage or destroy property "*used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce*" (emphasis added). Thus, we reject

---

[4] The government contends that even if there were an insufficient interstate commerce nexus to the Diversity Office, Mahon's convictions could still stand. This opinion does not address those additional arguments.

Mahon's facial challenge to the statute. *See Garcia*, 768 F.3d at 829-30 (rejecting the facial and as-applied challenges to § 844(i)).

Mahon insists that even if the statute is facially constitutional, it is unconstitutional as applied here. He argues that the statute's application encroaches into matters traditionally reserved for the states and that the federal commerce power cannot extend to the Diversity Office. This argument is equally unavailing—that the property or the crime might be traditionally local in nature does not foreclose § 844(i)'s application where the property possesses the requisite nexus to interstate commerce. *See United States v. Gomez*, 87 F.3d 1093, 1096 (9th Cir. 1996) ("Even though arson is a crime that has traditionally been the responsibility of the states, section 844(i) allows federal jurisdiction over arson, but limits it to those instances involving property connected to interstate commerce.").

Here, despite being a local government entity, the Diversity Office possessed the requisite nexus to interstate commerce. Among many activities, it: (1) partnered with national organizations to facilitate planning, hosting, and organization of events that attracted thousands of visitors and tourists to the city, (2) actively participated in at least four different chambers of commerce to cultivate relationships outside the city, (3) contracted with and paid for keynote speakers (budgeting $15,000 for one speaker), (4) advertised upcoming functions through various forms of media, and (5) solicited and approved vendors who wanted to sell food or provide entertainment at events. Given these undisputed facts and the previous section's analysis, Mahon's as-applied constitutional challenge is denied.

### III. CONCLUSION

For the reasons discussed, Mahon's challenges fail.  The Diversity Office had a sufficient nexus to interstate commerce to support Mahon's prosecution under § 844(i), and his facial and as-applied contentions lack merit.

**AFFIRMED**.